# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4988 | **DATE** | 2/9/2001 |
| **CASE TITLE** | | U.S.A. vs. Krisnaswami Sriram | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The plaintiff's motion for preliminary injunction (doc. # 1-2) is granted in part and denied in part. Enter order for preliminary injunction with an asset freeze of $1,651,527.05 of the amount currently held by in Account No. 700017538 at the Lake Forest Bank and Trust in the names of Krisnaswami and Rajalakshmi Sriram. Amounts held in Account No. 700017538 in excess of $1,651,527.05 (plus interest accruing on that sum) are not subject to this asset freeze and may be withdrawn. Property owned by defendant located in Lake Forest and Arlington Heights, Illinois is not subject to this asset freeze; however, this preliminary injunction order does not affect or alter in any way the order setting conditions of release for defendant in the pending criminal case, in which the property located in Lake Forest, Illinois is posted as security. Defendant's motion for release of excess monies and assets is granted; the alternative request for release of funds to pay living expenses and attorneys' fees is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| ✓ | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 12 2001 | |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | date mailed notice | |
| | JJK courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number 39

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )    No. 00 C 4988
vs.    )
    )    Magistrate Judge Schenkier
KRISHNASWAMI SRIRAM, M.D.,    )
    )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

On August 15, 2000, the Government filed this action alleging that the defendant, Krishnaswami Sriram ("Dr. Sriram"), fraudulently obtained at least $1,224,154.25 in Medicare payments. The Government asserted claims for civil penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729 (Counts II and III), as well as damage claims under common law theories of mispayment by mistake of fact (Count IV), unjust enrichment (Count V), and fraud (Count VI). In addition, the complaint asserted a claim for injunctive relief under 18 U.S.C. § 1345, asking that the Court enjoin the alleged fraudulent activity by Dr. Sriram and freeze "assets that are the product of, or profit on the product of, his fraud" (Compl. ¶ 47) (Count I).

With the complaint, the Government filed an ex parte motion for temporary restraining order, preliminary injunction and other equitable relief. On August 16, 2000, the district judge issued a temporary restraining order barring Dr. Sriram from engaging in future fraudulent activity, and requiring him to maintain and not to dispose of certain documents and records. That order also froze various assets of Dr. Sriram, including four bank accounts and three pieces of real estate which had

a collective value in excess of $4 million. By its terms, the initial temporary restraining order was due to expire on August 30, 2000.

At the time of the entry of the temporary restraining order, the district judge also referred the matter to this Court for a hearing on the Government's motion for preliminary injunction. Thereafter, as a result of a limited consent signed by all parties, the matter was reassigned to this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 for final ruling on any requested extensions of the temporary restraining order and on the motion for preliminary injunction (doc. ## 7-9); since that time, the parties have generally consented to the jurisdiction of this Court for all purposes (doc. ## 33-35). By agreement of the parties, the temporary restraining order, with some modification, was extended five times: on August 23, 2000 (doc. # 10), September 13, 2000 (doc. # 11), October 12, 2000 (doc. # 12), November 30, 2000 (doc. #15), and January 19, 2001 (doc. # 32). The temporary restraining order currently in effect is due to expire on February 14, 2001.

During the several months that the restraining order has been in effect, several events of significance to this case have occurred. *First*, pursuant to agreement between the parties, the specific bank accounts and property subject to the restraining order have been narrowed to three: (1) a certificate of deposit with a value of some $3.3 million, held in Account Number 7000017538 ("Account 7538") at the Lake Forest Bank & Trust; (2) real estate and improvements located at 611 Hunter Lane in Lake Forest, Illinois; and (3) real estate and improvements located at 715 East Falcon Drive in Arlington Heights, Illinois. Other accounts originally frozen have been released for Dr. Sriram's use; in addition, there have been some withdrawals of money from Account 7538 for use by Dr. Sriram in paying legal fees and other expenses. *Second*, criminal charges have been filed against Dr. Sriram. On November 2, 2000, the Government filed a criminal complaint against Dr.

2

Sriram and, on November 30, 2000, a grand jury returned an indictment against Dr. Sriram for ten violations of the mail fraud statute, 18 U.S.C. § 1341, and ten violations of the health care fraud statute, 18 U.S.C. § 1347. The indictment also asserts a claim under 18 U.S.C. § 982 for criminal forfeiture of certain assets, including Account 7538 and the two items of real estate and improvements that remain frozen under the current restraining order.[1] *Third*, on December 15, 2000, the Government filed an amended complaint in this case which asserts the same causes of action as in the original complaint, but increases the claim of a loss to the Government from Dr. Sriram's alleged fraud from $1.2 million to an amount no less than $1,651,527.05 (Am. Compl. ¶ 52).

Presently pending before the Court are two motions. The Government has moved for a preliminary injunction (doc. # 1-2), seeking to continue (1) the prohibition against submitting false claims; (2) the requirement to preserve and not to dispose of certain documents and records; and (3) the freeze on Account 7538 and the Lake Forest and Arlington Heights real estate and improvements. The Government argues that under 28 U.S.C. § 1345, it is entitled to a preliminary injunction freezing assets sufficient to guarantee, as far as possible, that the Government will be able to collect on the civil judgment it believes it will obtain. The Government further argues that it is likely to prove at trial that Dr. Sriram fraudulently obtained at least $1.6 million in Medicare payments, and that under the False Claims Act, 31 U.S.C. § 3729, the Government will be entitled to an automatic tripling of that amount plus an additional sum of at least $5 million in civil penalties.

For his part, Dr. Sriram, disputes that the Government is likely to prove that any fraud occurred, or that the amount of the alleged fraud is $1.6 million. Moreover, Dr. Sriram argues that

---

[1] In addition, as a condition of his release during the pendency of the criminal proceeding, Dr. Sriram was required to execute a $3.1 million bond, and to provide as partial security for that bond a forfeiture agreement and quit claim deed for the Lake Forest real estate and improvements that are a subject of the restraining order.

3

under Section 1345 only the amount shown to be traceable to the alleged fraud may be frozen, and that Section 1345 does not authorize the Court to freeze assets to secure a trebled damage award or penalties that may be imposed. Thus, Dr. Sriram has moved to release assets that exceed any amount that the Government might demonstrate it is likely to show was fraudulently obtained; in the alternative, if the assets currently under the restraining order remain frozen, Dr. Sriram requests the release of sufficient funds to cover monthly living expenses and payments for defense costs.

On January 16-18, 2001 the Court conducted an evidentiary hearing on the Government's motion for preliminary injunction. At that hearing, the Government called nine witnesses: Kathy Barbour, an FBI agent; Katherine Huber, an IRS agent; Drs. Anshu Gupta, John Haebich, and Ameeruddin Syed, all of whom practiced medicine for Home Doctors, an entity established by Dr. Sriram; Peter Theiler, an investigator with Wisconsin Physicians Services ("WPS"), an entity involved in providing Medicare reimbursement to doctors; Dr. Stephen Boren, who reviews claims for WPS; Lisa Suarez, who was employed by Dr. Sriram at various times in 1998 and 1999; Dr. Sriram's wife, Raji Sriram, whom the Government allege was involved in submitting billing claims for services allegedly provided to Medicare recipients; and Dr. Sriram himself. However, through the assertion of the spousal testimony privilege and her own Fifth Amendment privilege against self-incrimination, Ms. Sriram supplied no substantive testimony concerning either the billing practices of Dr. Sriram or their sources of income.[2] In addition, the Government called Dr. Sriram, who declined to answer any substantive questions based on his assertion of the Fifth Amendment. Dr. Sriram called no witnesses to testify in his behalf at the hearing.

---

[2]On January 16, 2001, the Court issued a ruling from the bench that the spousal testimonial privilege could be asserted in this proceeding, with the applicability of the privilege being determined on a question-by-question basis. On January 21, 2001, the Court issued a written opinion explaining that ruling in more detail.

The Court has received legal memoranda from the parties on the Government's motion for preliminary injunction, and on the defendant's assertion that Section 1345 does not allow the freezing of assets based on treble damages and possible penalties under 31 U.S.C. § 3729. On January 18, 2000, the Court also heard oral argument from the attorneys.

Based on the Court's review of the evidentiary record and the applicable legal authorities, the Court finds that the Government has established an entitlement to a preliminary injunction under 18 U.S.C. § 1345 prohibiting Dr. Sriram from submitting false Medicare claims, requiring him to preserve and not to discard certain documents and records, and freezing certain of his assets. However, the Court further finds under Section 1345, the amount of assets that can be frozen is limited to the amount that the Government has established it is likely to prove were traceable to the alleged criminal Medicare fraud – $1,651,527.05. The Court finds that Section 1345 does not empower courts to increase the amounts frozen to secure the collectibility of treble damages or penalties.

The Court sets forth below the findings of fact and conclusions of law that constitute the grounds for granting the Government's request for preliminary injunction. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such. *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).

# I.

**A.      The Parties.**

1. Plaintiff, the United States, is suing on behalf of the Department of Health and Human Services ("HHS"), which administers the Medicare program.

2. Dr. Sriram is a domiciliary of the State of Illinois and resides at 611 Hunter Lane, Lake Forest, Illinois. Dr. Sriram is licensed to practice medicine, and at all times relevant to this action, Dr. Sriram has provided physician services to Medicare beneficiaries.

**B.      Operation of the Medicare Program.**

3. Medicare is a program administered by HHS that provides health insurance for persons aged 65 and older, certain younger people with disabilities, and people with end-stage renal disease. Medicare has two parts: Part A (Hospital Insurance) and Part B (Medical Insurance). Medicare Part A helps pay for hospitalization costs, services rendered by skilled nursing facilities, home health and hospice care. Medicare Part B helps pay for physician services, outpatient hospital care and other medical services such as physical and occupational therapy.

4. HHS has delegated the administration of the Medicare program to one of its agencies, the Health Care Financing Administration ("HCFA"). In Illinois, HCFA contracts with Wisconsin Physicians Service ("WPS") to process Medicare Part B claims submitted for physicians' services.

5. Physicians who provide medical services to Medicare recipients are eligible to receive payment for covered medical services under the provisions of Title XVIII of the 1965 Amendments to the federal Social Security Act. A physician may submit a "Standard Application For Medicare Part B Provider Number" and enroll as a provider in the Medicare program as either a solo practitioner or as a member of a group practice (Am. Compl. ¶ 16). Those who become participating

6

providers in the Medicare Program agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicare. In order to receive Medicare funds, enrolled providers are required to abide by all the provisions of the Social Security Act and all applicable policies and procedures issued by HCFA.

6. All physicians, practitioners and suppliers who provide services or items to Medicare beneficiaries must have a Medicare provider number ("PIN number") before their claims for payment can be processed (Am. Compl. ¶ 15). A PIN number is unique to the doctor to whom it is assigned; a PIN number cannot be reassigned to another doctor (Theiler Tr.121-22).[3]

7. Once a physician receives a PIN number and begins providing services, the physician bills for those services by using Form HCFA-1500 (an example is set forth in GX 6). This standard form contains several "fields" in which a provider designates, among other information, the name and home address of the recipient of the Medicare services for whom payment is being claimed; the name and PIN number of the physician rendering the service; the dates on which a physician rendered the service for which the bill is being submitted to Medicare; and a code designating the type of service for which the physician is billing Medicare. Providing the correct patient address is important because when a claim for payment is made by the physician, the patient who allegedly received the medical services is sent an Explanation of Benefits ("EOB"). Patients who believe they did not receive the services claimed by the physician are invited to report this information by using a "hotline" number provided by the Medicare program.

---

[3]References to the testimony at the hearing will be designated by the name of the witness followed by "Tr. __." Exhibits offered by the Government will be cited as "GX __," and defense exhibits will be cited as "DX __."

8. The amount Medicare pays for a service rendered by a physician is based upon the code the physician identifies in the claim for payment. HCFA contracts with AdminaStar Federal to define national correct coding practices for payment of Medicare claims, using the American Medical Association ("AMA") Physicians' Current Procedural Terminology ("CPT") system (GX 1). The CPT is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians. CPT is the most widely accepted nomenclature for the reporting of physician procedures and services under government and private health insurance programs.

9. CPT codes 99201 through 99499 are used by a physician to report evaluation and management ("E/M") services. In the CPT Manual, the E/M section is divided into broad categories such as office visits, hospital visits and consultations. The subcategories of E/M services are further classified into specific codes. According to the CPT Manual, this classification is important because the nature of physician work varies by type of service, place of service, and the patient's status.

10. The CPT Manual states that a physician must perform the elements of patient service outlined in the description of a CPT in order to be entitled to claim payment under that code. Included in the description of most CPT codes is the level of severity of the patient's presenting problems. Codes designated by numbers at the higher end of the scale provide greater monetary payment than codes designated by numbers at the lower end of the scale (*e.g.,* a doctor making a home visit under a 99345 CPT code is paid more than a doctor making a home visit under a 99343 code). This is, in part, because the services described at the higher codes require more intense levels care by the physician (Boren Tr. 635).

## C.    CPT Code Time Parameters.

11. Incorporated into many of the E/M CPT codes are time parameters established by the AMA. The "inclusion of time as an explicit factor beginning in *CPT 1992* is done to assist physicians in selecting the most appropriate level of E/M services" (GX 1, at 4). The time parameters were established based on AMA "surveys of practicing physicians to obtain data on the amount of time and work associated with typical E/M services" (*Id.*). The AMA studies found that "intraservice time" (that is, time spent face to face with a patient, excluding time spent reviewing records and communicating with the patient or other professionals by telephone) "is predictive of the 'work' of E/M services" (*Id.*). The times listed reflect the amount of time typically necessary to provide the services described in each CPT code, as reported by the physician surveys.[4]

12. Although there is no evidence of how (or if) those surveys were conducted in a manner designed to ensure the statistical accuracy of the times listed, the unrebutted testimony indicates that the CPT times are very close to the average or expected amount of time needed to provide the services designated in each code. For example, Dr. Stephen Boren, the Medical Director of WPS, testified that the CPT codes approximate the time needed to perform the services described by each code. Although Dr. Boren admitted that a particular service described by a particular code could take somewhat more or less time than the time listed in the code, he also stated that the CPT times would be "typical" time frames representing a "good average" (Boren Tr. 617-18, 631; *see also*

---

[4]The Guidelines distinguish between "face-to-face" time and "total" time. For coding purposes, face-to-face time is defined as only that time that the physician spends face-to-face with the patient and/or family. "This includes the time in which the physician performs such tasks as obtaining a history, performing an examination, and counseling the patient" (GX 1, at 4). The time spent doing work before and after the visit, such as reviewing records, making phone calls and writing reports is "not included in the time component described in the E/M codes" (*Id.*) However, according to the Guidelines, the non-face-to-face time "was included in calculating the total work of typical services in physician surveys" and "[t]hus the face-to-face time associated with the services described by any E/M code is a valid proxy for the total work done before, during, and after the visit" (*Id.*).

Theiler Tr. 52). Moreover, Dr. Boren, who frequently deals with physicians in connection with their use of CPT codes, reports that no doctors have complained that the times listed in the codes are inaccurate, either at the high or the low end (Boren Tr. 627).

13. Dr. Boren testified that in choosing a code, a doctor focuses on the components of the service, not the time listed in the CPT code (Boren Tr. 620-27; *see also* Theiler Tr. 52, 119-20 (time is used by providers to help them choose codes, but it is not the key to selection of a code). Instead, a doctor chooses a CPT code based on the history, examination and decision making involved in the services provided to the patient (Boren Tr. 617). Nonetheless, the AMA specifically states that although time is not a descriptive component for the types of services provided, the ranges of time for each service listed in the CPT codes provide "a valid proxy for the total work done before, during, and after the visit" (GX 1, at 4). The AMA's finding was supported at the hearing by Dr. Boren's testimony. Dr. Boren stated that if a physician was repeatedly billing for the highest CPT code, Code No. 99345, which states 75 minutes as the typical amount of time a doctor would spend with a patient "face to face" in delivering the services identified in that code, then he would find it difficult to believe that this physician was repeatedly able to accomplish all of these elements of treatment in only 20 minutes of face-to-face time with patients (Boren Tr. 632). In other words, Dr. Boren testified that if a physician was consistently taking substantially less time than indicated by the applicable CPT code, then the physician probably was not doing all of the work necessary to justify the use of that code.

14. Defendant offered no evidence to rebut the AMA's own description of the time required to provide services identified in the CPT codes, or the testimony by Dr. Boren and Mr. Theiler that those time parameters represent the time a doctor typically would spend delivering the services

required to bill for payment under that code. The Court finds the Government's evidence credible concerning the significance of the time parameters in reflecting the amount of time typically necessary to perform the services specified by a particular CPT code.

**D.    Dr. Sriram's Applications For PIN Numbers.**

15.    On November 11, 1995, Dr. Sriram submitted 50 standard applications for Medicare Part B PIN numbers, requesting approval to become a participating Medicare provider at 50 separate hospitals in Chicago and the surrounding area. In each of the applications, Dr. Sriram applied as a solo practitioner. On each application, Dr. Sriram stated that the check and remittance notice should be sent to him at 715 East Falcon Drive, Arlington Heights, Illinois 60005, a residence Dr. Sriram still owns. Dr. Sriram obtained at least 23 PIN numbers in this manner.

16.    One of the 23 PIN numbers obtained was in connection with an application for a Medicare Part B PIN number which listed the individual/practice address of Edgewater Hospital, Suite C41, 5720 North Ashland Avenue, Chicago, Illinois. Dr. Sriram completed this application as a solo practitioner and specifically noted on his application, "SOLO-NOT JOINING A GROUP." As a result of this application, Dr. Sriram was assigned Medicare PIN number 371772.

17.    Another one of the 23 PIN numbers obtained in late 1995 was in connection with an application for a Medicare Part B PIN number which listed the individual/practice address of Edward Hospital, 801 South Washington Street, Naperville, Illinois. Dr. Sriram completed this application as a solo practitioner and specifically noted on his application, "SOLO-NOT JOINING A GROUP." As a result of this application, Dr. Sriram was assigned Medicare PIN number 371774.

18. Dr. Sriram later submitted a request to terminate the other 21 PIN numbers obtained through the 1995 applications. That request was granted, and Dr. Sriram did not use those other 21 PIN numbers for Medicare billing.

19. On or around March 1, 1996, Dr. Sriram submitted an application for a Medicare Part B PIN number as part of the group practice Mobile Doctors Management, LLC, 15800 West McNichols, Detroit, Michigan. As a result of that application, Dr. Sriram was assigned Medicare PIN number 378425. Medicare payments under this PIN number were remitted to Mobile Doctors Management, LLC.

20. On or about January 2, 1998, Home Doctors, 5720 North Ashland Avenue, Suite C41, Chicago, Illinois submitted a Medicare health care provider enrollment application. In the application, Dr. Sriram is listed as the owner and contact person. The application requested that Medicare payments for Home Doctors be directed to 611 Hunter Lane, Lake Forest, Illinois, where Dr. Sriram resides. As a result of that application, Home Doctors was assigned Medicare PIN number 437220. Medicare payments under this PIN number were made to the Home Doctors group. In a letter dated March 12, 1998, Dr. Sriram submitted a written request to terminate his Medicare PIN number 378425, which he had used for his work with Mobile Doctors.

21. On or about January 2, 1998, a Medicare health care provider enrollment application for an individual group member was submitted by Dr. Sriram. In the application, Dr. Sriram identified himself as a member of Home Doctors. As a result of that application, Dr. Sriram was assigned Medicare PIN number L63960 to use for claiming payment for Medicare services he delivered under the auspices of Home Doctors. Medicare payments under this PIN number were made to Home Doctors, which is owned by Dr. Sriram. In addition, at various times Dr. Sriram obtained provider

numbers for a number of additional physicians to provide services for Home Doctors:  Ramesh Bhatia (PIN number L67633); James Caruso (PIN number L68431); Jalal Dahshe (PIN number L78923); Anshu Gupta (PIN number L69588); John Haebich (PIN number L64854); Inderjote Kathuria (PIN number L72294); Chung Song (PIN number L77555) and Ameeruddin Syed (PIN number L63961).  The effective date of the Home Doctors' PIN number for each of those physicians was January 2, 1998, except for Dr. Song, whose provider number became effective on October 1, 1998.

22.  The applications Dr. Sriram submitted for Medicare PIN numbers for Home Doctors as a group and for himself as a member of the group contain a section titled "Penalties for falsifying information on the Medicare Health Care Provider/Supplier Enrollment Application."  The applications also include a certification section in which Dr. Sriram indicated that he "understands that any omission, misrepresentation or falsification of any information contained in this application or contained in any communication supplying information to Medicare to complete or clarify this application may be punishable by criminal, civil, or other administrative actions . . . ." (GX 19C: Medicare Health Care Provider Enrollment Application for Individual Group Member).

## E.     Dr. Sriram's Submission of Medicare Claims.

23.  Dr. Sriram began to submit Medicare claims electronically to the Medicare Part B contractor in 1996.  Since that time, Dr. Sriram has submitted claims to Medicare for physician services under his individual Medicare PIN numbers 371772 and 371774; L63960, his PIN number under Home Doctors; and L63961, L64854 and L69588, the PIN numbers of Drs. Gupta, Haebich and Syed.

24.  To submit claims in an electronic medium, a provider must sign an Agreement of Physician/Supplier Regarding Automated Billing.  In the Agreement, the provider acknowledges "that submission of a Medicare electronic medium claim is a claim for Medicare payment and that anyone who misrepresents or falsifies any record or other information essential to that claim, or that is required pursuant to this Agreement may, upon conviction, be subject to fine and imprisonment under Federal law" (*see* Am. Compl. ¶ 28).  The evidence shows that Dr. Sriram did not use a professional billing service to submit Medicare claims (*see, e.g.*, Suarez Tr. 151-52; 185); the claims made under Dr. Sriram's PIN numbers or those of Drs. Gupta, Haebich and Syed were prepared and submitted by Dr. Sriram or under his direction.

25. Dr. Sriram has billed Medicare for at least $13,704,688.12 for services that he or doctors working for him allegedly have rendered between October 1995 and August 2000.  It is undisputed that Medicare has paid Dr. Sriram at least $3,722,652.37 for those claimed services, under the following PIN numbers covering the following dates that the services allegedly were delivered to patients (Am Compl. ¶ 31):

| Provider No. | Dates of Service | Paid by Medicare |
|---|---|---|
| 371772 | 10/11/95-01/06/00 | $1,276,383.91 |
| 371774 | 11/28/95-10/22/99 | $ 666,292.85 |
| L63960 (Sriram/Home Doctors) | 01/01/98-08/14/00 | $1,160,862.84 |
| L63961 (Syed/Home Doctors) | 01/02/98-03/24/00 | $ 235,104.97 |
| L64854 (Haebich/Home Doctors) | 01/02/98-04/21/00 | $ 335,114.20 |
| L69588 (Gupta/Home Doctors) | 01/02/98-08/02/99 | $ 48,893.60 |

14

26. The evidence further shows that during the period 1996 through 1999, Dr. Sriram received $3,755,943.95 in payments from Medicare, Medicaid and insurance or other services. Of that sum, $2,734,188.00 (72.8 percent) came from Medicare payments (GX 8F). For purposes of the hearing, the defense stipulated that it would not challenge the Government's contention (if fraud were proven) that those funds came from Medicare payments (Hueber Tr. 223-24). There also is no dispute that Dr. Sriram possesses substantial assets: $3.3 million in Account 7538, the Arlington Heights and Lake Forest properties (free of any mortgages), and real estate in New York.[5]

27. The Government offered credible evidence at the hearing of a number of serious irregularities in Dr. Sriram's billing that the Court finds, both individually and taken together, make it likely that the Government will prove that a large number of fraudulent claims were submitted by Dr. Sriram, and that as a result he received a large amount of Medicare payments to which he was not entitled. We address that evidence in Sections F through L, below.

**F.    Claims for More Than 10 Hours in a Day.**

28. Using the time parameters set forth in the CPT codes, the Government offered sufficient credible evidence to show that Dr. Sriram received Medicare payments on 512 days on which he claimed he delivered more than 10 hours of face-to-face patient service. The Government also offered sufficient credible evidence to show that, in fact, Dr. Sriram did not perform that amount of work.

---

[5]There is evidence that despite these substantial revenues, Dr. Sriram may have been experiencing economic distress. The unchallenged evidence indicates that Dr. Sriram complained on various occasions that he was in risk of going into bankruptcy (Barbour Tr. 446). On the face of it, such complaints may seem hollow given Dr. Sriram's substantial income and assets. But no evidence has been offered as to Dr. Sriram's level of debt. Therefore, on this record the Court cannot make any finding as to whether Dr. Sriram's complaints were genuine (and thus arguably supplied a motive for fraudulent activity) or were merely a case of "crying poor" when he was not.

29.  The Government used the following calculation – set out in GX 21 – to quantify the amount of money paid to Dr. Sriram which is attributable to claimed services in excess of 10 hours a day:

   a.  The Government used a 10-hour day as the maximum number of service hours Dr. Sriram reasonably could provide, given travel time to and from his home and office to his patients' residences for the home medical visits being made. Agent Barbour testified that the 10- hour threshold was chosen for this calculation based on a number of factors (Barbour Tr. 551-52), including among other things her interview with Dr. Sriram on August 17, 2000, regarding his activities during an average day, evidence uncovered during execution of the search warrant at his Lake Forest home on that date, and statements made by Dr. Sriram in his proffer in the criminal investigation (Barbour Tr. 528, 558-59).[6]

   b.  To calculate the length of Dr. Sriram's work day, only those claims submitted under his individual PIN numbers 371774, 371772 and his Home Doctors PIN number, L63960, were used, since those submissions reflect work Dr. Sriram claimed to have performed. The Government added the number of hours listed in the CPT codes on all claims actually submitted – and paid –

---

[6]Agent Barbour cited the proffer as a major reason that she selected 10 hours as a threshold (Barbour Tr. 548, 558-59). Although the Court made clear it would require Agent Barbour to testify about what Dr. Sriram said in the proffer that she relied on, the defense chose not to ask Agent Barbour to disclose that information (and, in fairness, the Government also was not eager for her to do so). The Court will not reject Agent Barbour's sworn testimony that she relied on Dr. Sriram's statements in the proffer in the absence of evidence sufficient to undermine the credibility of that testimony.

for each date that Dr. Sriram claimed to provide to Medicare service, to reach a number of hours that Dr. Sriram purportedly worked in a given day.

c.  In determining the number of hours claimed in a day in excess of ten, the Government did not include claims submitted to Medicaid and other third-party payers, or claims Dr. Sriram submitted under other PIN numbers for the same dates of service. The Government also eliminated from this calculation claims Dr. Sriram submitted to Medicare using Dr. Sriram's provider number for Mobile Doctors (378425).

d.  Using this methodology, the Government determined that between October 1, 1996 and March 31, 2000, there were 512 days for which Dr. Sriram submitted claims (under PIN numbers 371772, 371774 and L63960) reflecting more than 10 hours of face-to-face patient service based on the CPT codes that he used to claim payments. After giving Dr. Sriram credit for in fact providing 10 hours of home patient Medicare service on each of these 512 days, the Government calculates, based on times listed in the CPT codes under which Dr. Sriram claimed payment, that he billed for 5821.74 hours past the 10th hour for these 512 days – or more than double the total number of hours the 10 hours assumption gave him for the 512 days (*i.e.,* 5120 hours) (GX 21).

e.  The Government then used a formula, unchallenged by Dr. Sriram at the hearing, to obtain an "hourly rate" for each hour billed by Dr. Sriram (*i.e.,* an

average of the amounts billed for the various CPT codes that have various reimbursement rates). This hourly rate was obtained by taking the total amount Medicare paid for the timed CPT codes and dividing that number, for each date of service, by the total hours measured by the CPT codes used by Dr. Sriram for services claimed on that day (GX 21).

f. That hourly rate was then multiplied by the number of hours in excess of 10 hours on a given day (as determined, again, by looking at the total CPT hours listed in the codes submitted as claims by Dr. Sriram for any given date of service) to arrive at a the dollar amount of the fraud on each of the 512 days for claims based as CPT codes with time parameters. For the 512 days in question, that resulted in a total calculation of $816,858.04 (GX 21).

g. The Government then added to this the total the value of services claimed under CPT codes without any time parameters (since, by definition, those services also exceeded the 10-hour threshold). That resulted in a calculation of $394,736.44 (GX 21).

h. Based on this calculation, the Government's evidence is that of the $1,954,169.32 in Medicare payments received by Dr. Sriram on the 512 days for which the CPT codes show more than 10 hours of face-to-face patient care, $1,211,594.48 was attributable to fraudulent claims (GX 21).

30. The Court finds the Government's calculations to be credible. For the reasons stated above (Findings 11-14) the Court finds that the evidence to date is sufficient to show that the use of the CPT time codes as a measure of time typically spent with a patient is reasonable. We also note

that the unrebutted (albeit sketchy) evidence is that the time parameters in the CPT code have been used by HCFA in at least one other court proceeding to support a claim of fraudulent Medicare payments (Barbour Tr. 545-46).

31. Moreover, the Court finds the 10-hour threshold used by the Government for the number of hours of face-to-face patient care that Dr. Sriram could provide in home visits on a single day is supported not only by the undisclosed information in the proffer, but by other evidence as well:

a.    Agent Barbour testified that during their August 17, 2000 interview, Dr. Sriram told her that he did not see more than 20-25 patients in a single day (Barbour Tr. 440) and that he was always home by 3:00 p.m. because that is when the "gang bangers" came out (Barbour Tr. 417). When asked about these statements, Dr. Sriram declined to answer based on his Fifth Amendment privilege; from this invocation of the privilege, the Court exercises it discretion to draw an adverse inference.[7]

b.    Those statements by Dr. Sriram are consistent with the testimony of Ms. Suarez. She testified that during the three time periods she worked for Dr. Sriram in 1998 and 1999, Dr. Sriram kept the following schedule: he would be home at 8:30 or 9:00 a.m. on a routine basis to receive her morning check-

---

[7]While an adverse inference against a witness "may be drawn from the invocation of the Fifth Amendment" in a civil case *Daniels v. Pipefitters Association Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993), drawing the inference "is permissible, but not required." *Id.* The Court in this case draws the inference in those instances in which Dr. Sriram was confronted with his alleged prior statements or other evidence and chose silence. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (emphasis added) ("the Fifth Amendment does not forbid adverse inferences against parties in civil cases when they refuse to testify *in response to probative evidence offered against them*"). Conversely, we will decline to draw an adverse inference from Dr. Sriram's assertion of the Fifth Amendment to respond to questions which find no support in the evidence.

in call (Suarez Tr. 138), and he would be at home when she called in before leaving work at approximately 5:00 or 5:30 p.m. (Suarez Tr. 139). Ms. Suarez testified that she only saw Dr. Sriram once a week for about 15 minutes when he came into the office to do paperwork (Suarez Tr. 137). Ms. Suarez also testified that she was responsible for scheduling visits and maintaining the patient charts and, based on this knowledge, she knew that Dr. Sriram rarely made home visits to his patients and only did so when the patient specifically requested to be seen by Dr. Sriram (Suarez Tr. 140).

c.    The 10-hour day threshold also is consistent with the testimony of other physicians at Home Doctors concerning their own schedules. For example, Dr. Haebich testified that when he worked for Home Doctors between July and October 1998, he saw an average of 8-10 patients per day (but never more than 15 in one day); he tried to schedule each patient at half-hour intervals, assuming he would be off by 15-20 minutes for each patient; that some patients would cancel or not be at home; and there would be travel time between patients. He testified that his typical day of patient visits would start at around 6:00 a.m., and would conclude at around 3:00 or 4:00 p.m. (Haebich Tr. 15). Likewise, Dr. Syed testified that when he worked for Home Doctors between March 1998 and October 1999, he would spend no more than about seven hours in face-to-face patient contact, although he would spend significant time traveling from patient to patient and in going

for scheduled visits where the patient turned out to be unavailable (Syed Tr. 251-52).

     d.    The issue of travel time is significant. The evidence showed that the nature of care at issue in this action is home visits, and that Dr. Sriram's staff rarely was able to coordinate the locations of the visits on a given day to minimize the travel time between patients (Suarez Tr. 133-34; Haebich Tr. 43-44; Syed Tr. 252).

32. For the foregoing reasons, the Court finds that the Government has offered sufficient credible evidence to show, at this stage, that claims by Dr. Sriram reflecting more than 10 hours each day of face-to-face patient care (based on CPT codes) likely were fraudulent. We note that the 10-hour threshold does not include Dr. Sriram's significant travel time from patient-to-patient (especially in the winter to poor, underserved areas in South and West Chicago from Lake Forest); the time Dr. Sriram spent recruiting other doctors to see his patients; or the uncalculated time that no one controverts Dr. Sriram spent billing for medical services (approximately $13 million worth from October 1995 through March 2000).

33. The Court has considered that this calculation using the 10-hour threshold reflects the third different damage theory sponsored by the Government. The Government's initial theory alleged fraudulently obtained payments of $455,220.05 based on services allegedly billed but not rendered to patients at the Edgewater and Edwards hospitals under Dr. Sriram's provider numbers 371772 and 371774 (DX 24, ¶¶ 42-45). Agent Barbour admitted on cross examination that her original understanding of Dr. Sriram's use of the 371772 and 371774 provider numbers was that Dr. Sriram was billing for services specifically rendered at Edgewater and Edwards hospitals. However,

that understanding proved to be wrong, as she now admits, because those numbers were assigned to Dr. Sriram to cover services provided in any hospitals in the counties where Edgewater (Cook County or 371772) and Edwards (Lake County or 371774) Hospital are located (Barbour Tr. 492-93; 495-96; *see also* Theiler Tr. 49, 104-05). The Government then shifted to a damage theory using a 16-hour threshold for patient service in a day (DX 27), which resulted in a calculation of $735,000 in allegedly fraudulent payments based on 295 days on which claims reflected more than 16 hours of service.

34. The defense argues that in light of these shifting positions, the Government's current calculation based on a 10-hour threshold is not reliable or credible. The Court declines to reject the current calculation merely because it has been revised. It is not uncommon in civil litigation for theories of damages (or liability, for that matter) to change and evolve as the case progresses, as new information is obtained, and as the information in a party's possession becomes better understood. For the reasons stated above, the 10-hour threshold finds sufficient support in the evidence, and the evidence shows that use of the CPT time parameters is reasonable. Moreover, the mathematical calculations made by the Government using those tools are unchallenged. The Court finds the calculations showing that Dr. Sriram received payments of $1,211,594.48 for claims of services in excess of 10 hours in a given day are supported by sufficient credible evidence.[8]

---

[8] During closing arguments, the Government argued that a damage calculation based on an 8-hour day, rather than a 10-hour day, would be reasonable given the evidence in this case. Such a calculation would have the effect of increasing the amount of money attributable to the fraud and, for purposes of the present motion, justifying an injunction freezing more than the $1,651,527.05 that the Government has attempted to show is traceable to Medicare fraud. The Court will not go where the Government has suggested, because the use of eight hours as the threshold rather than ten hours is not sufficiently supported by the evidence. Moreover, there has been no evidence offered as to what monetary amount an 8-hour threshold would yield, and the Court declines to speculate on that question.

### G. Dr. Sriram's Billings for Drs. Gupta, Haebich and Syed.

35. As the Government's exhibits point out with clarity, Dr. Sriram billed Medicare using the PIN numbers of Drs. Gupta, Haebich and Syed to bill for dates of service when they did not work for Dr. Sriram or for Home Doctors. As the payee for the group practice of Home Doctors, Dr. Sriram received substantial sums of money by Medicare for services that Dr. Sriram falsely claimed had been provided by these physicians (see, e.g. GX 7, 14, 15, 16A, 16B).

36. The evidence shows that Dr. Haebich worked for Home Doctors between July and October 1998. According to WPS records, on September 15, 1998 Dr. Haebich was issued PIN number L64854 for his work at Home Doctors. However, Dr. Sriram had Dr. Haebich's PIN number backdated to be effective as of January 2, 1998 (Barbour Tr. 472).

37. Dr. Sriram was responsible for submitting claims to Medicare for the work performed by Dr. Haebich on behalf of Home Doctors. Dr. Haebich kept a journal which indicates that he worked for Home Doctors and Dr. Sriram on 59 days between July and October 1998. However, the claims paid by Medicare for services allegedly rendered by Dr. Haebich reflect claims submitted to Medicare for 491 dates of service beginning in January 1998 (six months before he started working for Home Doctors) and continuing until December 1999 (14 months after he left Home Doctors). Based upon the dates that Dr. Haebich actually worked, at least $277,679.65 were paid to Dr. Sriram for services claimed under Dr. Haebich's PIN number, but which Dr. Haebich did not perform (GX 7).

38. Dr. Sriram also billed Medicare for services provided to patients under Dr. Syed's PIN number for dates when Dr. Syed did not work for Home Doctors. Dr. Syed testified that he worked at Home Doctors between March 1998 and October 1999. On average, he worked 2-3 days per

week, with about 10-12 weeks where he did not work at all, and several weeks toward the end of that period where he worked only once a week (Syed Tr. 244-45). The most patients that Dr. Syed saw in a single day was 13 or 14 (on one or two occasions) (Syed Tr. 251); he saw 12 patients on several other occasions (Syed Tr. 251), but on average, he saw 8-10 patients each day that he worked (Syed Tr. 251).

39. Dr. Syed was assigned provider number L63961 effective January 1, 1998. According to WPS records, the provider number was issued on July 21, 1998; again, this PIN number was backdated to January 1998 (Barbour Tr. 473). Dr. Sriram submitted claims using Dr. Syed's PIN number for the period from January 1998 (two months before he started at Home Doctors) through March 2000 (five months after he left) (GX 16B). Dr. Syed never worked on Sundays or Mondays (on Mondays, he always worked at a clinic downtown, so he could not have worked for Home Doctors on that day) (Syed Tr. 245, 261). However, the evidence shows that Dr. Sriram billed for Dr. Syed's services on various Sundays and Mondays throughout the March 1998 through October 1999 time period (GX 16B; Syed Tr. 254; 261). Dr. Syed also testified he never worked for Home Doctors on 17 consecutive days (Syed Tr. 254); but the evidence shows that Dr. Sriram submitted claims stating that Dr. Syed did so (*see* GX 16B).

40. According to Dr. Syed's testimony (Syed Tr. 246, 252-53) and his contemporaneous records (GX 16A), he rendered services for Home Doctors on 80-100 different dates. However, Dr. Sriram billed Medicare using Dr. Syed's PIN number on 415 different dates, and received $235,104.97 (GX 7). Dr. Syed testified that he could not have worked 415 days for Home Doctors an 18-month period (March 1998 through October 1999), because he was a part-time "moonlighter" physician (Syed Tr. 244, 262). Based on the dates that Dr. Syed actually worked, at least

24

$113,855.12 were paid to Dr. Sriram under Dr. Syed's PIN number, but for services Dr. Syed did not render.

41. Finally, the testimony established that Dr. Gupta worked for Home Doctors only on a single day in February 1999, seeing four patients and receiving payment from Dr. Sriram of $160.00 (Gupta Tr. 324-25; GX 25). However, without her knowledge, Dr. Sriram thereafter obtained for her a Home Doctor PIN number L669588. According to WPS records, the PIN number was issued on June 10, 1999, but again, Dr. Sriram had it backdated to be effective as of January 2, 1998 (Barbour Tr. 473). Dr. Sriram submitted claims using Dr. Gupta's PIN number on 220 different dates, and based on those claims Dr. Sriram was paid at least $48,893.60 (GX 7). Based upon the one day that Dr. Gupta actually worked, at least $48,397.80 was paid to Dr. Sriram under Dr. Gupta's PIN number, but for services she did not render.

42. Moreover, the evidence shows that these three doctors could not have provided as much service as Dr. Sriram claimed, even if the bills Dr. Sriram submitted were simply mistaken as to dates of service. Dr. Sriram told Agent Barbour that his doctors only saw an average of 8-10 patients each day (Barbour Tr. 444-45). That statement is consistent with the contemporaneous logs kept by Drs. Haebich and Syed (GX 15, 16A), as well as the documentary evidence submitted by the Government (see GX 14 showing how much other doctors worked); GX 25 (showing how much other doctors got paid by Dr. Sriram for their services while employed at Home Doctors)).

43. The testimony of the physicians provides further corroboration. Dr. Syed testified that only rarely did he see more than 8-10 patients in any one day (Syed Tr. 252-53). Dr. Haebich likewise testified that he would typically only see 8-10 patients, but no more than 15 in a single day

(Haebich Tr. 12). It would have been necessary for those doctors to see far more patients in a typical day if they really had delivered all the patient care for which Dr. Sriram claimed payment using their PIN numbers.

44. The defense offered the theory that Dr. Sriram may have merely used the PIN numbers of Drs. Gupta, Haebich and Syed to bill for services provided by other doctors (who may or may not have had PIN numbers) who actually provided services to Home Doctors patients. In aid of this theory, the defense elicited testimony from Mr. Theiler that simple mistakes in Medicare billing are common and are not necessarily considered to be material or fraudulent, because they may be corrected once discovered (Theiler Tr. 64). However, the defense has offered no credible evidence to show that this is what happened; moreover, the evidence of payments Dr. Sriram made to his Home Doctors physicians contradicts this defense theory.

45. The evidence shows that in 1998 and 1999, Dr. Sriram paid all physicians associated with Home Doctors (not just Drs. Gupta, Haebich and Syed) a total of $66,184.21 (GX 25). The Government offered evidence to show that Dr. Sriram paid his doctors $35.00 to $40.00 for each patient visit (GX 25). Using the figure of $35.00 per visit (which is an assumption generous to Dr. Sriram, since it would increase the number of visits he paid for), the $66,184.21 in payments reflects visits to nearly 1,900 patients. However, Dr. Sriram submitted claims for Drs. Haebich, Syed and Gupta showing more than 1,100 days of service. If, as Drs. Haebich and Syed testified (and as Dr. Sriram told Agent Barbour), they saw 8-10 patients per day, 1,100 days of service would yield approximately 9,000 to 11,000 patient visits for which they would have been owed the $35.00 fee. That would have resulted in payments by Dr. Sriram to this physicians of some $300,000 to

26

$400,000 – as compared to the $66,000 he actually paid them (GX 25). The Court finds that GX 25 contradicts the defense theory of mistaken billing, and further supports the Government case.

46. Finally, the Court finds no evidence to support the defense theory that Dr. Sriram might have named the wrong doctor in the claims he submitted due to a software glitch in his billing program. No evidence was offered as to how the billing software worked, or whether the "glitch" that the defense cites would have the effect of transposing one doctor's name for another. For the foregoing reasons, the Court finds the Government has offered credible evidence sufficient to show a likelihood of proving fraudulent payments in the amount of $439,932.57 in connection with claims submitted under Drs. Gupta's, Haebich's and Syed's PIN numbers for services they did not render.

## H.    Claims Submitted on Dates When Dr. Sriram was Overseas.

47. The evidence also shows that Dr. Sriram submitted claims stating that he rendered care to patients each and every day for three consecutive years: 1997-1999 (Barbour Tr. 410, 420). The evidence also established that Dr. Sriram was out of the country in January to mid-February 1997, August 1999 and December 1999 (Barbour Tr. 419). Even assuming Dr. Sriram worked seven days a week, 365 days a year when he was in the United States, plainly it was impossible for Dr. Sriram to make home visits to patients in the United States when he was outside the country.

48. The defense suggests that Dr. Sriram had other doctors provide services to his patients, and that he later billed for those services using his own PIN number. In particular, the defense points to Dr. Sriram's statement to Agent Barbour that he had Dr. Song visit patients for him while he was overseas in December 1999 (Barbour Tr. 520). The evidence shows that during the period April 1999 through June 2000, Dr. Song performed services for Home Doctors (GX 14), but Dr. Sriram never submitted a single claim using Dr. Song's PIN number. There is no evidence to

explain why, if Dr. Song provided services on behalf of Dr. Sriram while he was out of the country, Dr. Sriram did not simply submit the services provided by Dr. Song under Dr. Song's PIN number as a group claim for Home Doctors (with Dr. Sriram as the payee). Nor is there any evidence showing that Dr. Song's visits in fact were the ones for which Dr. Sriram billed while he was out of the country in December 1999. And, there is no explanation for Dr. Sriram's billings while outside the United States earlier in 1999 and in 1997. Based on the evidence at this stage, the Court finds that Dr. Sriram's submission of claims for dates he was outside the United States is credible evidence of fraud.[9]

## I. Dr. Sriram's Excessive Claims Regarding the Volume of His Patient Visits.

49. Agent Barbour testified that during an interview on August 17, 2000, Dr. Sriram told her that he never saw more than 20-25 patients in a single day (Barbour Tr. 440). When asked by the Government about his statement to Agent Barbour on this point, Dr. Sriram asserted his Fifth Amendment privilege against self-incrimination, an assertion from which we choose to draw an adverse inference.

50. Despite Dr. Sriram's statements to Agent Barbour, Dr. Sriram frequently billed Medicare for services he allegedly provided to more than 25 patients in a single day. For example, GX 21 shows that Dr. Sriram claimed to see more than 25 patients on 398 different days. On some of those days, Dr. Sriram claimed to see more than 100 patients, with the most extreme example being found

---

[9]Perhaps it is not uncommon for one doctor to ask another to substitute for him and then to bill as if he personally provided those services, as the defense suggests. However, the evidence shows that even if this commonly occurs, the Medicare regulations nonetheless require doctors to bill for services only if they, themselves, have provided those services, and to do otherwise is a violation of the Medicare procedures (Barbour Tr. 522-23).

in GX 13, which shows that on November 12, 1997, Dr. Sriram claimed payment for services allegedly rendered to 187 patients on a single day.

51. There is also other evidence corroborating Dr. Sriram's statement to Agent Barbour that he saw no more than 20-25 patients per day. Dr. Sriram told Agent Barbour that he was always home by 3:00 p.m. because that is when the "gang-bangers" would "come out" (Barbour Tr. 417).[10] This is consistent with the testimony of Ms. Suarez, who worked as closely with Dr. Sriram as any of the witnesses present in court, which indicated that Dr. Sriram was generally home before 9:00 a.m. in the morning and by 5:00 p.m. at night.

52. Drs. Haebich and Syed each testified that they usually could only see 8-10 patients per day, given travel time between appointments (and the expected dead time caused by cancellation of appointments and other no-shows of scheduled patients). This testimony is consistent with Dr. Sriram's statement to Agent Barbour that his doctors saw an average of 10 patients per day (Barbour Tr. 444-45).

53. And, Ms. Suarez confirmed that it was her practice (pursuant to Dr. Sriram's request and the requests of the other home doctors) to schedule at most 20 patients per day.[11] Moreover, according to Ms. Suarez, in late 1999, the number of patients who wanted to continue seeing physicians from Home Doctors began to decrease rapidly. Ms. Suarez testified that about 80 percent

---

[10] Given the reference to "gang-bangers" it is hard to believe the defense suggestion that Dr. Sriram would alight from his home to make house calls after dark or during the night. Thus, it does not seem reasonable to conclude that Dr. Sriram could see even 25 patients in a single day given travel times between homes, let alone 100 or 187 patients in a single day.

[11] Agent Huber testified that Ms. Suarez told her that she only pulled 10-15 patient files per day for each doctor to see; and that she would pull only 20 files if two doctors were working in a single day (Huber Tr. 202-03). However, Dr. Syed corroborated Ms. Suarez' testimony by stating that early in his employment with Home Doctors he would get more than 20 charts in a single day (Syed Tr. 251).

of the patients were lost during this time (*i.e.,* only 2 out of every 10 patients she called were making appointments) (Suarez Tr. 136), due to a number of complaints: including that, while patients liked Dr. Sriram, neither he nor his doctors visited them very often (Suarez Tr. 135; 37; 157).

54. In the face of this evidence, the defense has offered nothing to indicate to the Court that Dr. Sriram could legitimately claim to have seen more than 25 patients per day on each of the 398 days chronicled in GX 21; or more than 100 patients on some of those days; or 187 patients on November 12, 1997. The evidence of Dr. Sriram's claims that he saw more than 25 patients on nearly 400 different dates is credible evidence of fraud.

**J.     Billing For Services To Deceased Patients.**

55. The Government has offered unrebutted evidence that Dr. Sriram billed for Medicare services he claimed to have provided to 32 different patients who died prior to the date the service allegedly was rendered (GX 17A; GX 22). When asked about these claims, Dr. Sriram asserted his Fifth Amendment privilege; we draw an adverse inference from that assertion.

56. The defense has pointed out that some of those claims were made under CPT Code 99375, which allows billing for services rendered during a 30-day period (GX 1, at 40). From this, the defense urges that even though a patient was deceased on the date of service cited in the claim, perhaps the claim was valid because the service was rendered within the 30-day period preceding that date of service during which the patient was still living. Even setting aside the lack of evidence to substantiate this argument, the argument fails: (a) many of the claims were submitted by Dr. Sriram using other CPT codes which do not have this 30-day "window," and (b) a number of the claims using the 99375 code show a date of service more than 30 days after the patient died. The

evidence of claims for services rendered to patients on dates after they already had passed away is credible evidence of fraud.

## K. Complaints of Billing For Services Not Rendered.

57. Agent Barbour testified regarding 19 instances of billing by Dr. Sriram for services that were not rendered by him, as reflected by patient complaints made using to the HCFA "hot line" (Barbour Tr. 413). According to those complaints, the patients received Explanation of Benefit Statements ("EOBs") indicating that they had received medical services provided by Dr. Sriram on certain dates, but denied receiving such services (*see, e.g.*, GX 17B). Moreover, this evidence was bolstered by evidence regarding similar complaints made by private companies that insure their employees (GX 10-12). Here, again, Dr. Sriram asserted his Fifth Amendment privilege when confronted with this testimony and evidence, and we draw the adverse inference from his silence. The unrebutted evidence of billing for services not rendered is, at this stage, credible evidence of fraud.

## L. Listing Dr. Sriram's Address as the Patient's Address.

58. The Government has also provided the Court with credible evidence of numerous claims for which Dr. Sriram listed his own home address as the patient's home address. GX 13 contains 187 claims submitted by Dr. Sriram for services allegedly rendered on November 12, 1997; nearly half of those claims (84) listed Dr. Sriram's 611 Hunter Lane address as the patient's home address.

59. The evidence disclosed a potential motive for Dr. Sriram to submit claims listing his address as the patient's home address: the EOB is sent to the patient's home address as listed by the doctor on the claim form. By listing the 611 Hunter Lane address as the patient's home address, Dr. Sriram ensured that the EOBs would be delivered to Dr. Sriram, and not to the patient. As a result,

patients would not be in a position to complain that they failed to receive the services for which Dr. Sriram billed -- thereby hindering the detection of billing for services that were not rendered.

60. We draw an adverse inference from Dr. Sriram's assertion of his Fifth Amendment when confronted with this evidence. The Court finds the evidence sufficient to show at this stage that Dr. Sriram intentionally placed incorrect patient home addresses on claim forms.

## M. Unnecessary Services.

61. The Government also attempted to show that Dr. Sriram engaged in the provision of unnecessary services as a way to fraudulently bill Medicare for excessive payments. The provision of "unnecessary services" is a different type of fraud than the billing of unprovided services: the former assumes services were delivered (albeit too many), while the latter is premised on payment being obtained for services never rendered. Although the Government offered significant evidence of billing for unprovided services, the same cannot be said for the Government's proof on the excessive services theory.

62. The Government's evidence of provision of unnecessary services came almost exclusively from Dr. Syed. Dr. Syed testified that Dr. Sriram told him to always do a Pulse Oximeter ("Pulse") test on older patients (Syed Tr. 255). Although Dr. Syed said he did not agree that a Pulse test was always necessary, he agreed that the test was necessary 90 percent of the time (Syed Tr. 257-58). Dr. Syed also said that Dr. Sriram told him to always do blood tests and an echocardiogram, but he refused to do these tests (Syed Tr. 288-89). Finally, Dr. Syed testified that he was encouraged to give patients the dietary supplement "ENSURE," which he declined to do (Syed Tr. 259-60).

63. Dr. Syed's testimony regarding unnecessary services is not corroborated by the other evidence and testimony in the record; although Dr. Haebich testified, the Government did not question him on these matters. While the Government seems to imply that the ENSURE direction was part of a "kick back" scheme, it never offered proof to support that implication. Moreover, Dr. Syed admits he is not a cardiologist, and thus has no ability to challenge directions and diagnoses by Dr. Sriram, who is a cardiologist (Syed Tr. 270-71). And, Dr. Syed has a bias or motive to cast aspersions on Dr. Sriram's credibility given Dr. Syed's pay dispute with Dr. Sriram and the lawsuit Dr. Syed filed regarding that dispute (Syed Tr. 259, 263-66).

64. Given the lack of enough other evidence, the Court declines to draw an adverse inference against Dr. Sriram on these issues from the assertion of Dr. Sriram's Fifth Amendment privilege. At this stage, the Court finds that the Government has not offered sufficient evidence to support a finding that Dr. Sriram billed for the delivery of excessive services.

**N.    The Complexity of Medicare Billing.**

65. The defense offers the theory that Dr. Sriram's claims were not fraudulent but merely inaccurate, attributing the numerous irregularities to the complexity of the Medicare billing system and the fact that Dr. Sriram is, by his self-description, not a "professor of billing" (Barbour Tr. 446). There is no dispute that the use of CPT codes can be complex. The defense evidence also shows that the Medicare program does not require a physician to receive training or show proficiency in billing in order to get a PIN number and bill as a Medicare provider (Boren Tr. 630). However, the Court finds that this evidence is not sufficient to provide an innocent explanation for Dr. Sriram's actions.

66. *First,* as to the complexity of the CPT codes, Dr. Sriram, unlike Mr. Theiler, did not have to deal with the entire array of CPT codes; he only used a handful of codes to bill for his services

because he was a home doctor – at least for purposes of the present lawsuit – and Dr. Boren testified that the Medicare codes are not so complicated when that is the case. Dr. Boren further testified that many physicians, especially home doctors, do not really need extensive knowledge of the codes, since they use the same small number of CPT codes for their practice on a routine, consistent basis (Boren Tr. 633-34). Indeed, when he submitted claims for 187 patients allegedly treated on November 12, 1997, Dr. Sriram used the same CPT codes for all 187 (GX 13; Barbour Tr. 424).[12]

67. *Second,* although Medicare does not require any billing training to obtain a PIN number to provide services, Dr. Sriram took training in Medicare billing in December 1998, before he started billing for Home Doctors in March 1999 (GX 4). Moreover, the evidence shows that Dr. Sriram was not candid with Agent Barbour on this point, as he said he had received no training in CPT code billing (Barbour Tr. 446). The Court draws an adverse inference from Dr. Sriram's assertion of the Fifth Amendment when confronted with this statement.

68. *Third,* even apart from formal training, Dr. Sriram had access to materials issued by HCFA explaining how to do billing (*E.g.,* GX 1 and 2). Dr. Boren pointed out that, although physicians are not trained in how to code a service they provide for billing purposes before they receive a PIN number, they do receive the Medicare Part B bulletin which notifies physicians of courses on billing (Boren Tr. 619-20). Although the CPT manual and the codes change from year to year, any changes, modifications or deletions to the codes are marked by a symbol in the book, cross-referencing to an appendix that lists the changes (Boren Tr. 618). And, Dr. Sriram told Agent

---

[12]There is some facial contrast between Dr. Boren's testimony and that of Mr. Theiler, who testified that it took him one and one-half years to learn the CPT codes. Mr. Theiler, however, is responsible for understanding and applying the entire code on an ongoing basis; Dr. Sriram, as a home doctor, was, as Dr. Boren testified, probably only using a "small number" of codes on a routine basis, with minor exceptions for exceptional tests (Boren Tr. 633-34).

Barbour that he had no CPT manual, but the search warrant, executed immediately after that statement was made, revealed a copy of the 1998 CPT code (Barbour Tr. 443). Again, the Court draws an adverse inference from Dr. Sriram's assertion of the Fifth Amendment when confronted with this statement.

69. *Fourth,* if Dr. Sriram had not understood how to bill, even after his billing courses, he could have hired a professional to assist him. Agent Barbour testified that Dr. Sriram told her he had lost money by not using a billing service, but that he nonetheless had declined to use a billing service because he did not want to pay the fees charged by these services and because these services did not do rebilling (Barbour Tr. 440-41; *see also* Suarez Tr. 185).

70. The defense also tries to paint the picture of Dr. Sriram as an incredibly disorganized individual who was simply trying to practice medicine, his specialty, but was overwhelmed with work and paper, and who simply made some mistakes on the bills he submitted. The defense points to the documentary evidence and testimony in this case showing that Dr. Sriram did not bill for the services he and his doctors provided until many months after the services had been rendered. And, in fact, the evidence shows that the delay in billing, at least after the initial start up of the Home Doctors business, was approximately 14 months (Barbour Tr. 441) (indicating that Dr. Sriram told her he did not start billing for Home Doctors until March 1999). Thereafter, Dr. Sriram routinely delayed submitting Medicare claims for one to two years after the date the patient service allegedly was rendered (Barbour Tr. 445), even though HCFA imposes a financial penalty for claims submitted more than a year after service (Theiler Tr. 54).

71. The Court agrees that substantial evidence shows that Dr. Sriram was disorganized: for example, the evidence showed he was understaffed administratively, which caused problems in scheduling patient visits efficiently (Suarez Tr. 151). But there is no evidence that this disorganization is what caused the multiple and varying irregularities in his billings over an extended period. The types of billing irregularities outlined above – such as billing for services rendered to people who were already dead; claiming to see 187 patients in a single day; and listing his own home address as the home address of his patients – are actions that Dr. Sriram (or any doctor) needs no special training or a well-organized business to know are improper and must be avoided. Likewise, the Court finds that while the lateness of his billings may or may not show that Dr. Sriram's medical business, Home Doctors, was in disarray, it does not show that the inaccuracies in the bills he ultimately submitted were inadvertent.[13]

72. The Court finds when he obtained a PIN number to submit bills to Medicare, Dr. Sriram signed statements acknowledging that omissions, misrepresentations or falsification of any information in the bills might be punishable under federal law. In signing these certifications, Dr. Sriram necessarily accepted personal responsibility for the accuracy of his billing. Disorganized or not, it was Dr. Sriram's responsibility to ensure that his bills accurately reflected the services he and his doctors provided. Mr. Theiler acknowledged that the Medicare billing mistakes can happen, because a date is wrong or a the name of a doctor or a hospital is transposed or omitted. Perhaps if Dr. Sriram had 10 such billing irregularities, even a hundred of them, the Court would have more

---

[13]The Government theory is that the delay itself was intentional, in order to make it unlikely that patients who received EOBs would challenge Dr. Sriram's claims, and that if they did, he could assert that their memories had dimmed through the passage of time (Tr. 669). On the evidence presently before the Court, we believe disorganization rather than intent provides an equally credible explanation for the delay.

doubt about the adequacy of the evidence showing fraud. But the scope of billing irregularities is so vast and varied in this case that the Court finds, on the evidence before it, that those irregularities likely are the result of fraud.

## II.

The Government seeks a preliminary injunction that would prevent Dr. Sriram from (a) submitting false or fraudulent claims for payment to any health care benefit program; (b) disposing of or failing to maintain certain business record; and (c) disposing of or transferring the funds in Account 7538 and the Lake Forest and Arlington Heights real estate and improvements (which together have a value of some $4 million). The standards for obtaining a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure are well settled:

> "In assessing whether a preliminary injunction is warranted, a Court must consider whether the party seeking the injunction has demonstrated that: (1) it has a reasonable likelihood of success on the merits of the underlying claim; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if the preliminary injunction is denied; (4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest."

*Kiel v. City of Kenosha*, ____ F.3d ___, No. 00-2651, 2000 WL 18009 * 2, * 1 (7th Cir., Dec. 08, 2000). However, because it seeks a preliminary injunction under a specific grant of authority conferred by 18 U.S.C. § 1345, the Government argues that the traditional standards for a Rule 65 preliminary injunction are more truncated in this case. Thus, at the outset, we consider the standards that apply to the request for a preliminary injunction under Section 1345.

## A.

The Government argues that where, as here, an injunction is sought pursuant to a federal statute enacted to protect the public interest, no proof of irreparable harm, inadequacy of other remedies, or balancing of interest is required because "passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." *United States v. Diapulse Corp. of America*, 457 F.2d 25, 27 (2d Cir. 1972). The weight of authority supports the Government's position. *E.g.*, *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993) (in reviewing the grant of a preliminary injunction, the appeals court focused solely on likelihood of success); *United States v. Fang*, 937 F. Supp. 1186, 1199 (D. M.D. 1996) ("when a criminal statute provides for injunctive relief, once illegal activity is demonstrated irreparable harm is presumed; there is no need to demonstrate the inadequacy of a remedy at law. . . . [F]or the same reason, once the undesirable conduct is established, it is fair to conclude that the public interest will be served if appropriate injunctive relief is granted"); *United States v. Barnes*, 912 F. Supp. 1187, 1195 (N.D. Iowa 1996) (holding that proof of irreparable harm is not required under Section 1345 "because the statute itself states the ground upon which injunctive relief can be granted to be a showing that the injunction is 'warranted to prevent a continuing of its substantial injury to the United States or to any person or class of persons'"); *United States v. Quadro Corp.*, 916 F. Supp. 613, 617 (E.D. Tex. 1996) (holding that under Section 1345, "[i]rreparable harm need not be demonstrated because so long as the statutory conditions are met, irreparable harm to the public is presumed").

In arguing for this modified standard for preliminary injunctive relief under Section 1345, the Government in substance argues for application of a "public interest" test akin to the test the

Seventh Circuit has found applicable in certain actions under the Federal Trade Commission Act ("FTC Act"). In *FTC v. World Vacation Brokers, Inc.*, 861 F.2d 1020, 1028-29 (7th Cir. 1998), the Seventh Circuit held that in actions brought by the Federal Trade Commission under 15 U.S.C. § 53(b) to enjoin deceptive advertising prohibited by 15 U.S.C. § 45(a), a court need only consider the likelihood that the Commission will ultimately succeed on the merits and the balance of the equities. In so holding, the Court pointed out that Section 53(b) provides for preliminary injunctive relief "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, . . ." In addition, the Seventh Circuit cited to legislative history showing that in giving the Commission specific authority to seek injunctive relief under Section 53(b), Congress sought "to protect the American consumer from activity prohibited by Section 5 as quickly as possible[,]" 861 F.2d at 1028, and to relieve the Commission from "the requirements imposed by the traditional equity standard which the common law applies to private litigants." *Id.* at 1028-29 (*quoting* Conf. Rep. No. 624, 93d Cong., 1st Sess. 11 (1973)).

Unlike the case with the FTC Act, neither the statutory language nor the legislative history of Section 1345 contains a specific statement concerning the standards to be applied to requests for injunctive relief. On the other hand, as with the FTC Act, the legislative history reveals that in passing Section 1345, Congress intended to give the Government a powerful tool to obtain prompt and speedy injunctive relief.

The legislative history reflects Congress' concern that "[s]ince the investigation of fraudulent schemes often takes months, if not years, before the case is ready for criminal prosecution, innocent people continue to be victimized while the investigation is in progress. Experience has shown that

39

even after indictment or the obtaining of a conviction, the perpetrators of fraudulent schemes continue to victimize the public." S. Rep. No. 98-225, at 401-02 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3539-40. The legislative history also shows that while Congress understood that "present law provides limited injunctive relief" in cases involving criminal fraud, Congress found that "this relief is inadequate." *Id.* The "limited injunctive relief" referred to in the legislative history was that which was available under 39 U.S.C. § 3007, which authorizes the Government to seek a preliminary injunction detaining a defendant's incoming mail pending proceedings of 39 U.S.C. §§ 3005 (prohibiting false representations in connection with lotteries) and 3306 (prohibiting attempts to obtain money for transmittal of obscene materials). The legislative history reflects that in light of the dissatisfaction with the limited scope of this specific authority, Congress "concluded that whenever it appears that a person is engaged or is about to engage in a criminal fraud offense . . ., the Attorney General should be empowered to bring suit to enjoin the fraudulent acts or practices." S. Rep. No. 98-225, at 401-02 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3539-40.

At the time Section 1345 was enacted in 1984, the case law interpreting Section 3007 had held that an injunction under that statute did not require that the Government meet the common law standards (including irreparable harm) typically required for a Rule 65 injunction. *United States Postal Service v. Beamish*, 466 F.2d 804, 806 (2d Cir. 1972). Although Section 3007 provides that an injunction issued under that provision would be "pursuant to Rule 65 of the Federal Rules of Civil Procedure" (language which Section 1345 also employs), the *Beamish* court reasoned that this statement merely delineates the procedural mechanism applicable to a preliminary injunction hearing and did not incorporate the standards of proof applicable under Rule 65. *Id.*

The Court finds it particularly illuminating that Congress deemed the remedy under Section 3007 unsatisfactory because it did not go far enough. We trust that Congress was aware of the prevailing interpretation of Section 3007 as expressed in *Beamish*. *See Cannon v. University of Chicago*, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law"). Thus, it is significant that the legislative history does not suggest that Congress was dissatisfied with the interpretation of Section 3007 that relieved the Government of proving all the traditional elements necessary for a Rule 65 injunction.

Although the question is a close one, the Court agrees with the prevailing weight of authority that to prove an entitlement to a preliminary injunction under Section 1345, the Government need not prove all of the elements traditionally required by Rule 65. As the *Barnes* court observed, the statutory language in Section 1345 authorizing a preliminary injunction "as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought," reflects the goal of protecting people from criminal fraud -- surely no less a "public interest" goal than that which underlies the FTC Act. While the statutory language of Section 1345 does not specifically articulate the extent to which the traditional elements required for preliminary injunctive relief apply, the legislative history persuades the Court that Congress intended to relieve the Government of certain of the burdens normally imposed on one who seeks a preliminary injunction under Rule 65.

Thus, the Court finds that the Government need only prove a likelihood of success on the merits. However, because the case law is mixed as to what standard applies to likelihood of success on the merits, the Court addresses that issue before turning to the question of whether the Government has met its burden.

41

## B.

Some courts have held that the Government need only show probable cause to believe that a fraud has been committed. *E.g., United States v. Weingold*, 844 F. Supp. 1560, 1573 (D. N.J. 1994); *United States v. Williams Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1183 (E.D. N.Y. 1991); *United States v. Belden*, 714 F. Supp. 42, 45-46 (N.D. N.Y. 1987). Courts applying that standard have analogized to Section 3007, which specifically places on the Government the burden of showing "probable cause to believe" a violation has occurred. More recent decisions have required the Government to show by preponderance of the evidence that a predicate offense has been or is being committed. *Brown*, 988 F. 2d at 663; *Quadro Corp.*, 916 F. Supp. at 617; *Barnes*, 912 F. Supp. at 1194-95. One court has articulated yet a different standard: that is, whether the Government has established a "reasonable probability" that it will prove a predicate offense. *Fang*, 937 F. Supp. at 1200.

The Court believes that to establish a likelihood of success as required by Section 1345, the Government must show by a preponderance of the evidence that a predicate fraud offense has been or is being committed. We do not find a sufficient basis in the statutory language or legislative history of Section 1345 to apply a probable cause standard. Unlike Section 3007, Section 1345 does not by its express terms adopt that standard. In applying the preponderance of the evidence standard, the Court is mindful that under Rule 65, the likelihood of success standard may sometimes be met on proof that a plaintiff's chances are "better than negligible." *Roland Mach. Co. v. Dres. Indus. Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). However, the "better than negligible standard" applies where the facts have already established lack of an adequate remedy at law and irreparable harm in the absence of injunctive relief. *Id.* Here, the Court has found that Section 1345 does not require the

Government to prove those traditional elements; in that context, we believe that lowering the Government's burden of proof to obtain an injunction to showing that its case is "better than negligible" would give the Government a "substantial procedural advantage" that is not authorized by the statute. *Brown*, 988 F.2d at 663-64.

## III.

Guided by the foregoing legal principles, we address whether the Government has established an entitlement to an injunction under Section 1345 and, if so, the scope of the injunction that is warranted. The Government bases its claim for a preliminary injunction on the assertion that the Government likely will show that Dr. Sriram has violated three different fraud statutes. *First*, the Government alleges that Dr. Sriram has violated 18 U.S.C. § 287, which provides criminal sanctions for one who makes to any department or agency of the United States Government a claim, "knowing such claim to be false, fictitious or fraudulent[.]" *Second*, the Government asserts that Dr. Sriram has violated 18 U.S.C. § 1347, which provides criminal sanctions for one who knowingly and willfully does or seeks to defraud any health care benefit program, or to obtain by false and fraudulent means money or property under custody or control of any health care benefit program in connection with the delivery of or payment for health care benefits. *Third*, the Government asserts that Dr. Sriram has violated the False Claims Act, 31 U.S.C. § 3729, which imposes civil liability on one who "knowingly makes, uses or causes to made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." The Court concludes that the evidence at the preliminary injunction hearing establishes the Government's requisite likelihood of success on these fraud claims (although whether a civil fraud claim under the False Claims Act may provide a basis for injunctive relief under Section 1345 is a matter that the Court will address below).

As explained in the Findings, the Government's proof shows a broad array of conduct that makes it more likely than not that the Government will be able to show that Dr. Sriram knowingly and willfully submitted false claims to Medicare to obtain reimbursement to which he was not entitled. For convenience, the Court groups the conduct into seven categories.

*First*, Dr. Sriram submitted claims for Medicare services to 32 patients who were deceased on the dates the services allegedly were rendered (*see* Findings 55-56). The defense failed to offer even a theoretical explanation for the vast majority of those claims for services which, on their face, could not have been rendered.

*Second*, the Government offered nineteen specific instances in which patients complained to Medicare that Dr. Sriram had not rendered the services for which he claimed reimbursement (*see* Findings 57). The Government further bolstered this evidence by offering instances outside the Medicare context where insurers wrote to Dr. Sriram complaining that he sought reimbursement for services not rendered.

*Third*, a sample of claims for reimbursement submitted by Dr. Sriram revealed numerous instances where Dr. Sriram listed his own home address as the home address for the patient he allegedly treated (*see* Findings 58-60). This evidence was significant in that by listing his own address as that of the patient, Dr. Sriram insured that the EOBs would not be sent to that patient, and that those patients therefore would not be in a position to know (and to complain) that claims were being made for services that were not rendered. This evidence was relevant both to explain why

more patient complaints were not made concerning services claimed but not rendered, and to show an intent by Dr. Sriram to conceal a fraudulent activity.[14]

*Fourth*, the evidence showed hundreds of instances in which Dr. Sriram submitted claims based on seeing more patients in a day than he has since admitted seeing (*see* Findings 49-54). On August 17, 2000, Dr. Sriram told Agent Barbour that he saw at most twenty to twenty-five patients per day. That statement also was consistent with the testimony of Ms. Suarez, who said that she scheduled at most twenty patients per day. Yet, the evidence submitted at the hearing showed that there were 398 days on which Dr. Sriram claimed that he saw more than twenty-five patients (GX 21); on one of those days, he claimed to have seen 187 patients (GX 13).

*Fifth*, and in a related vein, there were hundreds of days where Dr. Sriram submitted claims that, based on the CPT codes under which he submitted payment, would indicate that Dr. Sriram spent more than ten hours in face-to-face patient treatment (*see*, Findings 28-34). While the defense vigorously contested the validity of using the CPT codes as a representation of the time spent with patients, for the reasons explained above (Findings 11-14) the Court is satisfied that, based in the evidence submitted at this preliminary stage and given the Government's burden of proof in this proceeding, the use of the timed CPT codes in that manner is reasonable. And, at this stage, the Government has shown a likelihood of success in proving that there was fraud associated with claims submitted by Dr. Sriram for which the CPT codes show more than ten hours of patient care in a day. The evidence shows that it is implausible that Dr. Sriram spent more than 10 hours per day in

---

[14]The evidence discloses another possible reason why more patients did not complain about services that Dr. Sriram claimed but that may not have been delivered: there was a consistent delay by Dr. Sriram of more than one year between the dates of services allegedly rendered and the submission of the claims for those services. The delay in billing for an extended period of time provides one explanation for the low level of complaints as compared to claims made, since many of the elderly and/or ill patients may have died, forgotten about the services, or not cared enough to complain after such a lapse of time.

delivering face-to-face patient care; yet on 512 difference days, Dr. Sriram submitted claims for reimbursement under CPT codes which indicate that he spent more (and often substantially more) than ten hours treating home-visit patients.[15]

*Sixth*, the evidence shows that Dr. Sriram billed for service to patients every single day for three consecutive years: 1997, 1998 and 1999 (Finding 47). Given the unrebutted evidence that Dr. Sriram billed for services on a number of days when he was out of the country in 1997 and 1999 (Findings 47-49) and that patients complained that Dr. Sriram did not visit them very often (Finding 53), the Government has shown a likelihood of success in proving that this volume of claims was fraudulent.

*Seventh*, the evidence shows that Dr. Sriram submitted claims for payment using the PIN numbers of Drs. Gupta, Haebich and Syed for services they allegedly rendered both on dates before they ever came to work with Dr. Sriram, and on dates after they left Dr. Sriram's practice (Findings 35-46). The evidence showed that while these doctors saw patients for Dr. Sriram on approximately 140 to 160 dates, he submitted claims based on those doctors seeing patients on more that 1,100 different days (*see* GX 7). The evidence cannot support an inference that their PIN numbers were merely assigned to different physicians before these individuals joined the Home Doctors practice or after they left; the PIN number is unique to a specific doctor, and cannot be assigned to another (Finding 6).

---

[15]Alternatively, if Dr. Sriram in fact saw all the patients he claimed on those days and provided services to them, the evidence would be consistent with the conclusion that Dr. Sriram did not provide the services indicated by the CPT codes and thus engaged in "upcoding" – that is, claiming a more intensive (and time consuming) level of care than was actually delivered. There would be a financial motive to "upcode," because Medicare reimbursement is greater the more intensive the treatment provided.

The Court has considered the defense arguments that of all this conduct is susceptible of innocent explanation. The primary defense argument on this score was to emphasize the complexity of Medicare billing and Dr. Sriram's lack of experience and sophistication in that process; the fact that errors and mistakes in Medicare submissions for reimbursement are common; and the disarray of his practice. The Court concludes that the evidence offered to date in support of these theories is insufficient to undermine the Government's likelihood of success.

The defense has emphasized that Medicare coding and billing is a complex procedure, and that by his own admission to Agent Barbour, defendant is not "a professor of billing." The defense also points to evidence that Mr. Theiler testified that it took him several years to become fully comfortable and familiar with use of the CPT codes. However, balanced against this evidence is the unrebutted evidence that Dr. Sriram only dealt with a handful of the CPT codes, and when dealing only with a limited subsection of the CPT codes, their use is not terribly complicated (Boren Tr. 634); that Dr. Sriram had access to Medicare materials explaining how to bill (GX 2, 3) and took a training seminar in billing (GX 4) several months before he first started billing for Medicare patients under Home Doctors; that, contrary to these facts, he told Agent Barbour on August 17, 2000 that he had no training in Medicare billing, that he had no CPT manual at home, and that he did not have materials at home concerning Medicare billing; that if Dr. Sriram felt he was at sea about how to correctly bill for Medicare payments, he could have hired a professional to assist in billing, but did not do so because it would cost him money; and that Dr. Sriram interviewed one potential candidate to do his Medicare billing, but declined to hire him because "I know more about CPT codes" (Suarez Tr. 185-86). Moreover, the Government's evidence concerning the types of activity in which Dr. Sriram engaged – such as, billing for services delivered to patients who were not living on the date

47

the service was allegedly rendered; claiming to see 187 patients in a single day; listing as the patient

addresses his own home address; and repeatedly using doctors' PIN numbers to bill for services that

were rendered before those physicians came to Home Doctors or after they left – simply cannot be

chalked up to a lack of sophistication or training.[16]

The defense also points to the testimony concerning the disarray of Dr. Sriram's office

procedures. And, indeed, the testimony was uniform that Dr. Sriram lacked the administrative

support necessary to efficiently organize patient visits. However, the disorganization and

understaffing that affected the scheduling of patient visits does not, *ipso facto*, show that Dr. Sriram

also was in disarray concerning the submission of claims. The problems identified with respect to

office administration focused on the scheduling of patients out of the Home Doctors office at

Edgewater Hospital. Unlike the case with patient scheduling, Dr. Sriram did not rely on his staff to

do the Medicare billing: all of it was done by him or at his specific direction, and was done almost

entirely out of his home rather than at Edgewater Hospital.

Finally, it is not surprising that given the vast scope and administrative requirements of the

Medicare program, errors and mistakes concerning dates of services and procedures performed can

occur (Theiler Tr. 63-67). Thus, the defense is correct that the mere fact of an error on a claim does

not alone require an inference of fraud. However, the evidence produced in this case so far as shown

more than simple errors: the large volume and variety of serious billing irregularities over an

extended period of time, shows that the Government more likely than not will be able to prove that

---

[16]The defense also pointed to the fact that the Government evidence shows fewer claims exceeding ten hours in a day beginning with dates of service in the latter half of 1999 (*see* GX 21). However, that evidence also is consistent with the fact that Dr. Sriram typically delayed for more than a year in submitting claims, and that by August 2000, Dr. Sriram had been restrained by an order in this case from submitting false claims.

what was afoot here was a scheme to defraud and not merely innocent error by a novice in the Medicare process. Based on this evidence, the Court concludes that the Government has shown that it has satisfied the statutory for requisite to injunctive relief under Section 1345.[17]

## IV.

We now turn to the proper scope of the preliminary injunction. Section 1345(a)(1)(C) empowers a court to enjoin a person from committing a Federal health care offense. One of the claims which serves as a predicate for the Government's Section 1345 claim is 18 U.S.C. § 1347, which without question is a health care offense: the statute is titled "Health Care Fraud," and creates criminal liability for one who knowingly and willfully does or attempts to defraud a health care benefit program, or to obtain by false or fraudulent representations money under the control of a health care benefit program. At this point, the Government has shown a likelihood of success on its claim that Dr. Sriram knowingly and willfully submitted false claims for Medicare payment, and as a result of those claims received substantial payments to which he was not entitled. At the time the temporary restraining order was entered, Dr. Sriram had not abandoned his Medicare practice. There is no evidence that his practice could not continue in the absence of a preliminary injunction. Based on the evidence to date, the Court finds that the Government has established its right to a preliminary injunction enjoining Dr. Sriram from submitting false claims for Medicare payments. Similarly, the Government is entitled to an order requiring maintenance and preservation of records.

---

[17]The Court notes that the Government evidence also would be sufficient to meet the traditional requirements of Rule 65. The evidence shows the threat of irreparable harm and inadequacy of legal remedy: the likelihood a criminal fraud against a public program is proof of irreparable harm. *U.S. v. Barnes*, 912 F. Supp. at 1195-96; *W. Savran & Assoc. Inc.*, 755 F. Supp. at 1179-80. Given the showing a likelihood of success by the Government and the paucity of contrary defense evidence at this time, the balance of equities weighs in favor of the Government: put another way, the risk of erroneously granting preliminary injunctive relief is less than the risk of erroneously granting it. And, plainly the public interest is served by an injunction that, pending trial, prevents any (further) fraudulent activity, preserves records, and ensures a fund against which recovery can be had of any funds obtained by fraud.

## V.

Section 1345 also empowers the Government to seek a preliminary injunction freezing

certain assets. In particular, Section 1345(a)(2)(B)(i) provides, in relevant part, that "[i]f a person

is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a

result of . . . a Federal health care offense . . . or property which is traceable to such violation, the

Attorney General may commence a civil action in any Federal court . . . for a restraining order to –

. . . prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any

such property or property of equivalent value." In considering the Government's request for a

preliminary injunction continuing to freeze some $4 million in Dr. Sriram's assets, we begin with

the question of the Government's proof at the preliminary injunction hearing concerning the alleged

amounts that Dr. Sriram fraudulently obtained in Medicare payments.

## A.

The Government's evidence showed that Dr. Sriram was paid $3,722,452.37 in Medicare

payments for services allegedly rendered between October 1995 and August 2000 (Finding 25). At

the preliminary injunction hearing the Government offered evidence attempting to show that

$1,651,527.05 of the money Dr. Sriram received in Medicare payments were attributable to

fraudulent claims (GX 7). The Government offered two calculations to support that calculation.

*First*, the Government claims that Dr. Sriram obtained $439,932.57 in payments fraudulently

obtained by submitting claims under the PIN numbers of Dr. Gupta, Haebich and Syed for days that

those physicians did not perform services for Home Doctors. As the Court has previously found, the

Government's evidence is more than sufficient to establish a likelihood of success on the

Government's assertion that Dr. Sriram fraudulently submitted claims using those physicians' PIN

numbers for nearly one thousand dates of service. The defense has not offered any evidence or argument to refute the Government's calculation of the amount of payment attributable to claims for those dates of service. The evidence at this stage is sufficient for the Government to show a likelihood of success in proving that $439,932.57 obtained using the PIN numbers of Drs. Gupta, Haebich and Syed was obtained by fraud.

*Second*, the Government asserts that it is likely to prove that Dr. Sriram fraudulently obtained $1,211,594.48 in Medicare payments on the 512 days on which, based on the time parameters associated with CPT codes, he submitted claims reflecting more than ten hours of face-to-face patient treatment in a particular day. For the reasons stated above, the defense attacks on this calculation are insufficient at this stage: (1) the Court declines to treat this calculation as unworthy of credibility solely because it reflects a third iteration of the Government's theory of damages (*see* Finding 34); (2) the Court finds the evidence supports use of the time parameters associated with the CPT codes as a representation of time spent typically with a patient (*see* Findings 11-14); and (3) the Court finds that based on the evidence adduced – such as, Dr. Sriram's own statements, the corroboration by testimony of Ms. Suarez, Dr. Haebich and Dr. Syed, and the fact that Dr. Sriram's home visit practice required significant travel time – the Government's use of the 10-hour threshold for the face-to-face patient time Dr. Sriram reasonably could spend in a day is not arbitrary (*see* Findings 31-32). Moreover, on nearly eighty percent of the 512 days that Dr. Sriram claimed services that reflected more than ten hours of patient interaction in the day, he also claimed to have seen more than twenty-five patients on that day (GX 21) – which is contrary to his statement to Agent Barbour that he saw most twenty to twenty-five day in a given day (Barbour Tr. 440). This provides further circumstantial evidence of the reasonableness of the ten-hour threshold.

The defense has not offered evidence to attack other assumptions contained in this damage calculation, and therefore the Court finds that the Government has met its burden of showing a likelihood of success in proving $1,211,594.48 in fraudulent payments from these claims submitted by Dr. Sriram. Taken together with the proceeds from claims submitted in the names of Drs. Gupta, Haebich and Syed for services they admittedly did not deliver, the Court finds that the Government has shown a likelihood of success in proving that Dr. Sriram obtained $1,651,527.05 based on fraudulent Medicare claims. Because the Court finds that the Government is likely to show that this amount is "traceable to such violation," under Section 1345, the Government is entitled to a preliminary injunction freezing that amount of assets.

**B.**

However, the Government argues that more should be frozen. The Government argues that because the False Claims Act provides for trebling of damages plus imposition of civil penalties, the Court should preliminarily freeze assets sufficient to cover a judgment in that enhanced amount. As a fallback position, articulated for the first time at the close of the preliminary injunction hearing, the Government also argues that the Court should continue the freeze on the entire $4 million of assets currently subject to the temporary restraining order because the Government's proof shows that it is likely to obtain a judgment in that amount without considering trebling or penalties.

Taking the second argument first, the Court rejects the Government's fallback position on the ground that it is not supported by the evidence. The Government has shown that Dr. Sriram was paid $3,722,652.37 through the Medicare program for services allegedly rendered between October 1995 and August 2000 (Finding 25). As explained above, the Government has also shown that it is likely to prove that $1,651,527.05 of Medicare payments received for services rendered since

52

1996 were obtained through fraud. The Government's new theory requires the assumption that *none* of the remaining balance of Dr. Sriram's Medicare payments was legitimate, and that he in essence operated a shell business which never engaged in any patient care. The evidence simply does not support such an assumption, as three doctors testified that they performed services for patients under the auspices of Home Doctors, and those physicians as well as other witnesses testified that Dr. Sriram himself performed services for patients. Just as the Court will not accept defendant's request to reject the Government's damage analysis because further discovery and analysis may erode it, the Court will not accept the Government's attempt to expand the damage analysis on the ground that further discovery may enhance the amount of damages proven.

That leaves the core Government argument for freezing an amount in excess of the $1,651,527.05 that the Government has shown it likely will prove was gained through fraud: that in fixing the amount to be frozen, the Court is authorized under Section 1345 to take into consideration trebled damages and penalties available on the civil claim under the False Claims Act, 31 U.S.C. § 3729. That argument raises two issues: whether a civil claim can provide a predicate for injunctive relief under 18 U.S.C. § 1345, and if so, whether the Court can enjoin not only the amount "traceable to [a] violation," but also an amount reflecting trebled damages and civil penalties.[18]

---

[18]The statutory language leaves no doubt that proceedings under the False Claims Act are civil, not criminal. Section 3729 provides for a "civil penalty" and treble damages; Section 3730 describes actions brought by the Government or private persons alleging violations of Section 3729 as civil; and Section 3731 reinforce that actions under the Act are civil rather than criminal by adopting the standard of proof as preponderance of the evidence.

# 1.

As explained above, the Court has found that the Government has a likelihood of proving a violation 18 U.S.C. § 287 and 18 U.S.C. § 1347, both of which qualify as criminal "health care offenses." The Section 1347 claim, which is set forth in the pending indictment, and Section 287 plainly provide a basis for injunctive relief under Section 1345. However, neither of those criminal statutes provides for trebling of damages.

The Government's argument that an amount in excess of $1,651,527.05 can be frozen is premised on a likelihood of proving a civil violation under the False Claims Act. Therefore, although raised by neither party, the Court believes that a threshold issue is whether preliminary injunctive relief under Section 1345 may be based on the likelihood of proving a *civil* claim as opposed to a *criminal* violation. For the reasons that follow, the Court concludes that a civil claim may not provide the basis for the injunctive relief authorized by Section 1345.

We begin with an analysis of the statutory language. *See, e.g., Good Samaritan Hospital v. Shalala*, 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter'"). Section 1345(a)(1) sets forth the claims that may provide a predicate for injunctive relief under Section 1345. Each of the specifically enumerated statutory provisions cited as a predicate for Section 1345 relief is a criminal statute. Section 1345(a)(1)(A) provides that the basis for an injunction under Section 1345 may be a violation or potential violation of "this chapter" (which is a reference to Chapter 63 of the Criminal Code), or of 18 U.S.C. §§ 287, 371 or 1001. Section 1345(a)(1)(B) states that an injunction may be premised on a banking law violation, as defined in 18 U.S.C. § 3322(d), which in turn defines banking law violation as violations of various sections of the criminal – not civil – code. 18 U.S.C.

54

§§ 215, 656, 657, 1005-1007, 1014, 1344, and 1341 and 1343 (insofar as they affect a financial institution). *See* 18 U.S.C. § 3322(d)(1). Finally, Section 1345(a)(1)(C) provides that an injunction may issue on the basis of a "Federal health care offense." The Court believes that the most reasonable construction of the term "Federal health care offense" is that it refers to criminal violations, and not breaches of civil law.

As an initial matter, the word "offense" is most commonly used in the law to refer to a violation of the criminal codes and not a breach of obligations under civil law. *E.g.*, BLACK'S LAW DICTIONARY, 1108 (7th ed. 1999). *See also Brown v. Hoffman*, 843 F.2d 1386 (table), No. 87-1621, 1988 WL 30667 (4th Cir. 1988) (*citing* BLACK'S LAW DICTIONARY for proposition that while the word "offense" is used in various senses, it generally implies a felony or misdemeanor infringing public rather than merely private rights and is punishable under the criminal laws – although it may also include violations of a criminal statute for which the remedy is merely a civil suit to recover the penalty.) While there are times that the word "offense" may connote a civil violation, the context of Section 1345 indicates that is not the case here. Each of the specifically enumerated statutory predicates for an injunction under Section 1345 is a violation of the criminal code, and not of civil law. Using the statutory construction tool of *ejusdem generis*, we read the term "Federal health care offense" to apply to the same type of violation as the specifically enumerated violations that precede that phrase: that is, to criminal violations and not civil law breaches. *See, e.g., AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 408 (1999) ("[u]nder the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration"). While *ejusdem generis* does not apply where the context of

the document or statute reflects that the drafter intended a different interpretation, there is no such intent reflected in the statutory language of Section 1345.

Because the Court finds the statutory language reveals a clear legislative intent to require an alleged criminal violation as a basis for Section 1345 relief, there is no need to go farther. Nonetheless, the Court notes that this interpretation of "Federal health care offense" is entirely consistent with the legislative history of Section 1345.

Section 1345 was enacted as part of the Comprehensive Crime Control Act of 1984, and its genesis was the congressional decision to expand the Government's authority to obtain injunctions to restrain the commission of criminal acts. S. Rep. No. 98-225, at 401 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 3539. After recounting the inadequacies of the existing authority for the Government to obtain that kind of relief, the Senate Report noted that "the Committee has concluded that whenever it appears that a person is engaged or is about to engage in a *criminal* fraud offense prescribed by Chapter 63 [of Title 18], the Attorney General should be empowered to bring suit to enjoin the fraudulent acts or practices." *Id.* at 3540 (emphasis added). The Senate Report states clearly that the reason for granting this new statutory authority was "to prevent a continuing and substantial injury to the class of persons designed to be protected by the *criminal statute* allegedly being violated." *Id.*" (emphasis added).

Nothing in the legislative history indicates that Congress intended the new power conferred by Section 1345 to be used to address civil frauds. To the contrary, the language of Section 1345 as originally enacted in 1984 specifically extended the injunction authority only to reach conduct "which constitutes or will constitute a violation of this chapter" – and "this chapter" was a reference to Chapter 63 of Title 18, which at the time dealt with mail fraud, wire fraud and bank fraud. While

56

Section 1345 has been amended on several occasions since originally enacted in 1984, none of those amendments contains statutory language or legislative history that changes the core purpose of Section 1345: to give the Government the authority to obtain injunctive relief against an existing or potential criminal violation, before a trial has been conducted and (as here when the restraining order was sought) even before criminal charges are brought.[19]

Finally, we note that the lead cases that the parties have cited under Section 1345 all involve efforts by the Government to obtain injunctive relief under Section 1345 based on a purported criminal violation. *E.g., Brown*, 988 F.2d at 659 (based on alleged violations of 18 U.S.C. §§ 286, 287 and 1341); *Fang*, 937 F. Supp. at 1188 (based on alleged violation of 18 U.S.C. § 1341); *Quadro Corp.*, 916 F. Supp. at 615 (based on alleged violations of 18 U.S.C. §§ 1341, 1343); *Barnes*, 912 F. Supp. at 1189 (based on alleged violation of 18 U.S.C. § 1341). The Government has cited no case, and the Court's independent research has found none, which has used a civil law violation as the basis for relief under Section 1345.[20] The Court holds that the Government may not do so here.[21]

---

[19]In 1988, as part of the Anti-Drug Abuse Act of 1988, Section 1345 was amended to include specific references to certain criminal statutes outside of Chapter 63 of Title 18: 18 U.S.C. §§ 287, 371, and 1001. As part of the Crime Control Act of 1990, Congress added the specific authority now found in Section 1345(a)(2) to freeze assets obtained through criminal banking violations. And, as part of the Health Insurance Portability and Accountability Act of 1996, Section 1345 was further amended to add Section 1345(a)(3), which specifically confers authority to issue injunctive relief in connection with "Federal health care offense(s)" – although the case law already had extended Section 1345 to cover criminal frauds to improperly obtain Medicare payments. *E.g., United States v. DBB, Inc.*, 180 F.3d 1277, 1282-85 (11th Cir. 1999).

[20]*DBB, Inc.*, involved a civil action asserting claims under 31 U.S.C. §§ 3729, *et seq.* and various state law civil theories of recovery, as well as a claim for a freeze of assets under Section 1345, in connection with an alleged scheme of Medicare and Medicaid fraud. The decision does not disclose whether there was a pending criminal action, or whether the civil complaint alleged criminal violations as the predicate for the Section 1345 relief. However, the Court's discussion of the legislative history further confirms that the goal of Section 1345 was to provide a way for the Government to prevent pre-judgment disposition of assets obtained through criminal activity. *DBB, Inc.*, 180 F.3d at 1282-83..

[21]During the discussions that led to the 1986 amendments to the False Claims Act, an amendment was proposed that would have added to 31 U.S.C. § 3729 specific authorization for the Government to obtain "preliminary injunctive relief to bar a defendant from transferring or dissipating assets pending the completion of a false claims action." *See* S.

57

## 2.

Even if the Government could use a civil violation under 31 U.S.C. § 3729 as the basis for an asset freeze under Section 1345, the Court believes a fair reading of Section 1345 does not permit the amount frozen to include a sum that accounts for trebled damages and civil penalties. Once again, we begin with the statutory language, which states that what may be frozen is "property which is traceable" to the predicate violation, or if that property is unavailable, property "of equivalent value." 18 U.S.C. § 1345(a)(2)(B)(i). The Court reads the term "property which is traceable" to the violation as meaning just what it says: that an injunction is authorized to put a hold on the fruits of the criminally fraudulent activity. Had Congress intended to extend injunctive authority to embrace assets not only traceable to the violation but also assets sufficient to secure an ultimate money judgment, it would have been a simple matter for Congress to plainly say so. But the Court finds nothing in the language of Section 1345 that indicates that Congress intended to go so far.

Once again, neither party has cited case law – and the Court has found none – that specifically addresses the question of whether Section 1345 may be used to preliminarily freeze assets which exceed those traceable to a violation but which would cover other elements of an ultimate judgment (such as penalties or costs). However, the cases do uniformly state that the assets frozen must be "traceable to the allegedly illicit activity." *Fang*, 937 F. Supp. at 1194 (citing cases); *see also Brown*, 988 F.2d at 664 (reversing preliminary injunction because in freezing assets, "the district court failed to distinguish between the proceeds from the alleged Medicare fraud and

---

Rep. No. 99-562, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N., 5266, 5280. The stated purpose of this amendment was to create a uniform federal standard for prejudgment attachment, thus "avoiding the whims and vagaries of the widely varying state procedures for attachment." *Id.* at 23, *reprinted* at 5288. The legislative history does not disclose why this proposal did not make its way into the final bill as enacted. However, there is nothing in the legislative history to suggest that the proposal was dropped because Congress considered the injunctive relief provided under Section 1345 available for civil claims based on the False Claims Act.

untainted funds from the seventy-five percent of the *Brown's* business that is unrelated to Medicare claims"); *Quadro*, 916 F. Supp. at 619 ("[t]he district court may freeze only those assets [at which the Government has proven by preponderance of the evidence] to be related to the alleged fraud").[22] These statements are consistent with this Court's statutory interpretation that under Section 1345 only those assets traceable to the alleged violation may be frozen.

In reaching this statutory interpretation, the Court declines defendant's request to treat Section 1345 as a criminal statute and thus construe it "in favor of lenity" to the defendant. *Cleveland v. United States*, ___ U.S. ___, 121 S. Ct. 365, 373 (2000). While Section 1345 is located in the criminal code, an action commenced under Section 1345 is specifically designated as "a civil action." 18 U.S.C. § 1345(a)(1), (2). However, there is independent reason to reject the broad interpretation of Section 1345 that the Government urges. The remedy of a preliminary injunction freezing assets pending the outcome of litigation provided under Section 1345 is one that is not generally available under Rule 65. In *Grupo Mexicano de Sarrollo S.A. v. Alines Bond Fund, Inc.*, 527 U.S. 308 (1999), the Supreme Court held that Rule 65 does not authorize a court to issue a preliminary injunction preventing the disposition of assets pending a contract claim for money damages. In reaching this conclusion, the Court found that "such a remedy was historically unavailable from a court of equity[.]" 527 U.S. at 333. The Supreme Court recognized that prior case law established limited circumstances when a preliminary injunction could be used to restrain

---

[22]The Court is mindful that in *Brown*, the appeals court also characterized the authority to freeze assets as extending to those assets that "might be forfeitable to the United States in the event that fraud is established at trial." 988 F.2d at 664. We read this statement as merely another way of saying that what may be frozen is the property traceable to the fraud, since that property would be subject to a forfeiture claim in a criminal action. The Court does not read this language (as the Government suggests) to mean that the *Brown* court would authorize a freeze of assets not traceable to the fraud but that would secure a potentially large civil money judgment – particularly given that the *Brown* court reversed the injunction because the extent of assets frozen exceeded the amount that could be traced to the alleged Medicare fraud.

movement of assets prior to judgment (such as, where a creditor's bill was filed seeking equitable assistance in the collection of a debt, *Decker v. Independent Shares Corp.*, 311 U.S. 282 (1940), or where specifically authorized by a statutory provision, such as the tax injunction statute, *United States v. First National City Bank*, 379 U.S. 378 (1965)), and that Federal Rule of Civil Procedure 64 authorizes the use of prejudgment attachment remedies available under state law. 527 U.S. at 330-31.[23] But the Supreme Court held in *Grupo Mexicano* that Rule 65 does not authorize an injunction to freeze assets merely because a plaintiff fears that by the time a judgment is obtained the assets will have been dissipated.

*Grupo Mexicano* does not bar the Government's effort to freeze assets here because the Government moves for the preliminary injunction under a specific statutory authorization, as was the case in *First City National Bank*. But the analysis in *Grupo Mexicano* counsels caution in expanding the sweep of that authority to freeze assets beyond the specific grant of authority made by Congress. So, too, does the practical reality that an asset freeze can exert "extraordinary leverage" against a defendant in a criminal fraud case. *Fang*, 937 F. Supp. at 1202. In this case, the Government has adequately shown at a preliminary stage that $1,651,527.05 million "is traceable to the violation" that the Government has a likelihood of proving. The Court concludes that the Government is entitled to freeze that amount of assets, but no more.

---

[23] There also is a federal statute that authorizes the Government to seek prejudgment attachment for the collection of a "debt": 28 U.S.C. § 3101. This statute, like Section 1345, grew out of the Crime Control Act of 1990. *See* H. Rep. Nos. 101-681 (Parts I and II) (1998), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6636 (Section 3101 "shall constitute the exclusive civil procedures for the United States to recover a debt or to obtain a prejudgment remedy in an action on a claim for debt, in lieu of the state-law procedures that the Federal Rules of Civil Procedure generally prescribe for prejudgment remedies and enforcement of judgments" – that is, Rule 64).

## CONCLUSION

A decision on a motion for preliminary injunction is often rendered at an early stage in the proceeding on a record that is only partially developed, and this case is no exception. For example, there are various assumptions and premises in the Government's damage calculations that, with the fullness of discovery and trial, can be more rigorously tested. Further discovery and analysis may bolster the Government's damage theory, undermine it, or lead to other avenues of damage calculation not presently before the Court. Thus, the Court's findings and conclusions on all issues here, both liability and damages, are by no means binding if and when the case should proceed to trial. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000) (court's findings and conclusions at preliminary injunction stage and by nature preliminary and are therefore not binding on summary judgment; *Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1218 (7th Cir. 1989) (findings at preliminary injunction stage not binding at trial).

For the foregoing reasons, the Government's motion for preliminary injunction (doc. # 1-2) is granted in part and denied in part. Defendant's motion for immediate release of excess monies and assets is granted; the alternative request for a release of funds sufficient to cover monthly living expenses and fees is denied as moot.

The Court therefore enters the following preliminary injunction:

(1) Dr. Sriram is preliminarily enjoined and prohibited from defrauding any health care benefit program and/or from obtaining, by means of a false or fraudulent representation, any money under the custody or control of any health care benefit program;

(2) Dr. Sriram is enjoined and prohibited from taking any actions to collect payments for Medicare claims that have been submitted but not yet paid. Any future payments

made on claims that have been submitted but not yet paid will be held in escrow pending further order;

(3) Dr. Sriram is enjoined and prohibited from failing to maintain business, financial, patient and accounting records concerning his Medicare claims and the proceeds from those claims and from disposing of those business, financial, patient and accounting records or from altering them in any way; and

(4) The sum of $1,651,527.05, which is part of the amount presently on deposit at the Lake Forest Bank and Trust ("the Bank"), under Account Number 700017538, in the names of account holders Krishnaswami Sriram and Rajalakshmi Sriram, as well as interest accruing on that sum of $1,651,527.05, is frozen, and may not be released or transferred by the Bank or withdrawn, transferred, alienated or encumbered by Dr. Sriram or those acting in concert with him. Amounts held in Account Number 700017538 in excess of the principle sum of $1,651,527.05 (plus interest accruing on that sum) are not subject to this preliminary injunction and may be withdrawn. The asset freeze imposed by this preliminary injunction does not extend to the real estate and improvements located at 715 East Falcon, Number 115, Arlington Heights, Illinois and at 611 Hunter, Lake Forest, Illinois; however, this preliminary injunction does not affect in any way the order setting conditions of release for Dr. Sriram in the pending criminal case, in which the property at 611 Hunter, Lake Forest, Illinois is posted as security for that bond.

This preliminary injunction will remain in force and affect until further order of the Court.

Pursuant to Section 1345(a)(3), the Government will not be required to post a bond as a condition of this preliminary injunction.

ENTER:

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: February 9, 2001**