Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4988 | **DATE** | 2/21/2002 |
| **CASE TITLE** | USA vs. Krishnaswami Sriram, M.D. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** For the reasons set forth in the attached memorandum opinion and order, defendant's motion for release of funds (doc. # 53) is GRANTED in part. The Court hereby authorizes the immediate release of all unfrozen funds in Account 700017538 at the Lake Forest Bank & Trust ("Account 7538"), except for $250,000.00, to be used solely for the purposes designated in paragraph 4(B)(i),(ii) of the 04/30/01 Amended Preliminary Injunction Order. Upon a showing that the amount released is insufficient to cover trial expenses, the Court at the time of trial will authorize the release of amounts remaining in Account 7538 that exceed $1,651,527.05 (and the interest that has accrued on that sum since 02/09/01) as necessary to pay for trial expenses.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| ✓ | Notified counsel by telephone. | FEB 22 2002 date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | CM docketing deputy initials |
| | Copy to judge/magistrate judge. | |

**Document Number**

65

JJK7 — courtroom deputy's initials

date mailed notice

U.S. DISTRICT COURT CLERK

02 FEB 21 PM12:45

Date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00 C 4988 |
| vs. | ) | |
| | ) | Magistrate Judge Schenkier |
| KRISHNASWAMI SRIRAM, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The Government has filed this civil action seeking injunctive relief and damages based on its assertion that the defendant, Krishnaswami Sriram ("Dr. Sriram"), has fraudulently sought and obtained no less than $1,651,527.05 in reimbursement for Medicare services (Am. Compl. ¶ 52). In addition to this civil action, the Government has instituted a criminal proceeding against Dr. Sriram: *(United States v. Sriram,* 00 CR 894)  the second superseding indictment currently alleges sixty-four counts, comprising claims of violations of the mail fraud statute 18 U.S.C. § 1341 (Counts 1 through 12); the healthcare fraud statute, 18 U.S.C. § 1347 (Counts 13 through 39); the false claims statute, 18 U.S.C. § 287 (Counts 40 through 60); and tax fraud statute, 26 U.S.C. § 7206 (Counts 61 through 64). The indictment also seeks forfeitures of assets derived from the activity alleged in the counts alleging healthcare fraud (Counts 13 through 39).

On August 17, 2000, the district judge then presiding over the civil action entered a temporary restraining order freezing the following assets of Dr. Sriram:  (1) a certificate of deposit held in account number 700017538 at the Lake Forest Bank & Trust ("Account 7538"), which then had a value of some $3.3 million; (2) real estate and improvements located at 611 Hunter Lane in

Lake Forest, Illinois; and (3) real estate and improvements located at 715 East Falcon Drive in Arlington Heights, Illinois. Thereafter, the parties consented to the jurisdiction of a magistrate judge in the civil action to preside for all purposes (doc. ## 33-35), and on January 16-18, 2001, the Court conducted an evidentiary hearing on the Government's motion for a preliminary injunction. On February 9, 2001, the Court issued a Memorandum Opinion and Order ("the February 9 Order") granting the Government a preliminary injunction freezing certain assets of Dr. Sriram, but limiting the value of the assets frozen in Account 7538 to $1,651,527.05 – the amount, based on the evidence submitted, that the Government had established it was likely to prove is traceable to the alleged criminal Medicare fraud (doc. #39). The Court held that amounts in Account 7538 in excess of that sum (and interest accruing on it) were not subject to the preliminary injunction, and could be withdrawn by Dr. Sriram. The Court further held that the preliminary injunction freezing assets did not extend to the Arlington Heights or Lake Forest properties (although at the time the Lake Forest property was independently posted as security for Dr. Sriram's order of release in the pending criminal case).

By joint request of the parties, the release of funds pursuant to the Court's February 9 Order was stayed until May 1, 2001 (doc. ## 40-41, 45-47). On April 30, 2001, by agreement of the parties, the Court entered an amended preliminary injunction order. By the time this Order was entered, Sachnoff & Weaver, Ltd. ("the Sachnoff firm") had entered the criminal and civil cases on behalf of Dr. Sriram, replacing the law firm of Cotsirilos, Tighe & Streicker, which previously had

represented Dr. Sriram. Since the entry of the amended preliminary injunction order, the Sachnoff firm has been sole counsel to Dr. Sriram in the civil and criminal matter.[1]

Consistent with the Court's February 9 Order, the amended preliminary injunction order froze the sum of $1,651,527.05 (plus interest accruing on that sum) in Account 7538. With respect to the more than $1.6 million remaining in Account 7538 that were not frozen by the Court's February 9 Order, the amended preliminary injunction order provided that $1 million would be released immediately to the client escrow account of the Sachnoff firm, to be used for the following purposes: (1) to pay $7,500.00 a month for living, medical, educational and other ordinary household expenses for Dr. Sriram and his family, and (2) "payment of accrued and future legal fees and expenses incurred in the defense of the criminal and civil actions filed by the government" (04/30/01 Am. Prelim. Inj. Order ¶ 4(B)). The amended preliminary injunction order further provided that defendant could petition the Court for release of the amount remaining unfrozen in Account 7538 that was not disbursed, and set forth the criteria by which such a request would be judged:

> "Upon notice to the government and with a full right to object, the defendant may petition the Court for release of an amount greater than the $1 million in the event legal fees and other expenses are higher than anticipated. If such petition is filed, the Court will examine the reasonableness of the petition through an *in camera* and *ex parte* review of the invoices."

(04/30/01 Am. Prelim. Inj. Order ¶ 4(C)).

The motion presently before the Court involves defendant's request for release of additional defense funds under this provision of the amended preliminary injunction order (doc. #52).

---

[1] The lawyers at the Sachnoff firm did not formally file their appearances in the civil (doc. # 49) or criminal (doc. # 63) matters until May 21, 2001. However, the time records submitted by defendant in connection with this motion show that the Sachnoff firm began working on these matters for Dr. Sriram beginning in early March 2001.

Defendant claims that release of all of the unfrozen funds remaining in Account 7538 is warranted because the Government has expanded the scope and complexity of the case and has thus caused the legal fees and other expenses to be "higher than anticipated."[2] The Government resists the motion, on several grounds: (1) that defense counsel is overstating the complexity of the case and the work required to defend it; (2) that defense counsel undertook the representation with its eyes wide open as to what the case involved; (3) that this money should not be used to pay attorneys when Dr. Sriram has a $600,000.00-plus tax obligation that remains unpaid; and (4) that Dr. Sriram should be required to fund his defense though other monies that are available to him or that he could earn through employment other than as a doctor (since the amended preliminary injunction order bars him from practicing medicine or providing health care services). Defendant disputes that these latter two considerations are even relevant to the Court's inquiry, and persists in his assertions concerning the complexity of the case and defense counsel's lack of awareness of that complexity when the amended preliminary injunction order was entered).

The Court has received and considered the briefs submitted by the parties, as well as detailed time and billing information submitted by the Sachnoff firm describing the services performed by each involved attorney and paralegal on a daily basis.[3] For the reasons that follow, the Court grants

---

[2]When the motion was filed on December 20, 2001, it was represented that some $633,000.00 remained in Account 7538 available for withdrawal. However, the Court at that time ordered that $50,000.00 be released immediately, pending ruling on the motion, to be used solely for retained expert expenses (doc. # 53).

[3]The time and billing information, as well as affidavits from Dr. Sriram and a paralegal at Sachnoff, Mr. Beifuss, disclosing privileged material have been reviewed *in camera* and without the Government receiving copies. The Court rejects the Government's request for access to the billing information (Gov't. Mem. at 8); the amended preliminary injunction order provides that these materials will be treated as privileged, to the extent they contain privileged information (which they do), and that a petition for release of funds will not constitute a waiver of privilege (04/30/01 Am. Prelim. Inj. Order ¶ 4(C)). At the Court's request, defense counsel has submitted an affidavit setting forth the terms of the representation – there being no written retention agreement (02/20/02 S. Miller Aff.). After an *in camera* review, the Court has allowed a redacted copy of that affidavit to be supplied to the Government, eliminating only those portions that reveal confidential communications. *See In the Matter of Walsh*, 623 F.2d 489, 494-95 (7th Cir. 1980).

4

the motion for release of additional funds, but not in the full amount that defendant seeks. The Court grants the request for release of all non-frozen funds in Account 7538 except for $250,000.00, which will be reserved for trial expenses.

## I.

Since the parties do not agree on the standard by which this motion is to be judged, we begin by addressing that question.

Dr. Sriram's current motion does not seek release of any portion of the $1,651,527.05 (plus accrued interest) that the Court's February 9 Order found the Government was likely to prove is traceable to the alleged criminal Medicare fraud. It is that amount, and only that amount, that the Court's February 9 Order froze. Accordingly, because the amount that Dr. Sriram seeks to have released is not part of the sum that the Court ordered frozen, this is not a situation where the Government may argue that those funds are completely unavailable to use for attorney fees. *See e.g., United States v. Monsanto*, 491 U.S. 600, 614, 616 (1989).

What defendant seeks to have released is the amount remaining in Account 7538 in excess of the amount frozen. Under the Court's February 9 Order, that amount – as well as the $1 million that was released pursuant to the amended preliminary injunction order – would have been available to Dr. Sriram, without any preconditions. However, by virtue of the amended preliminary injunction order, the parties mutually agreed to place certain strings on the release of this money. While the Court does not know precisely what led the parties to make this agreement, the Court can envision reasons why each side might do so. By agreeing to the amended preliminary injunction order, the parties would avoid the possibility that the Government would take an appeal asserting a right to freeze more than the $1.6 million-plus set forth in the February 9 Order, or that Dr. Sriram would

5

take an appeal challenging the freezing of any funds. The agreed preliminary injunction order also conferred another benefit upon defendant (and his counsel): it provides that any funds released from Account 7538 that are used for payment of legal fees and expenses are "without recourse to the law firms, attorneys, expert witnesses and third-party vendors engaged in the defense and representation of the defendant," and that the Government "waives any and all claims, rights, title or interest in any such funds via either a forfeiture proceeding or any other legal cause of action" (04/30/01 Am. Prelim. Inj. Order ¶ 4(D)).

Accordingly, the funds that defense counsel seeks to withdraw are neither frozen (and thus completely unavailable to defendant and his attorneys pending the outcome of the case), nor available at the mere request of the defendant. Under the amended preliminary injunction order, there are two criteria that defendant must satisfy in order to withdraw the funds in question.

*First*, the defendant must show that legal fees and related expenses are "higher than anticipated" (04/30/01 Am. Prelim. Inj. Order ¶ 4(C)). In the Court's view, this standard requires defendant to show both that the case has taken twists and turns that could not reasonably have been foreseen as of April 2001, when the agreed amended preliminary injunction order was entered, and that those unforeseen developments have increased the costs of defense so that the original amount released no longer is adequate.

*Second*, defendant must show that his expenditures for legal representation to date have been reasonable. The Court finds this requirement in the provision of the amended preliminary injunction order that states that if a petition is filed, "the Court will examine the reasonableness of the petition through an *in camera* and *ex parte* review of the invoices" (04/30/01 Am. Prelim. Inj. Order ¶ 4(C)). The only reason to require submission of invoices (which reflect detailed information about the

specific tasks performed by counsel and the time spent on them) is for the Court to ascertain whether the money already received has been reasonably spent; if all that was required was to show that the money in fact has been spent, summary bills that did not disclose the specific tasks performed would be sufficient.

In light of these criteria set forth in the agreed preliminary injunction order, many of the arguments raised by the parties to support or oppose the release of funds are irrelevant. The amended preliminary injunction order does not authorize the Court to base its decision on whether Dr. Sriram has some substantial, outstanding tax obligation (Gov't. Mem. at 1-2); or the extent of Dr. Sriram's assets that are not subject to the amended preliminary injunction order, that he could use to fund his defense (*Id.*, at 2-3); or whether certain expenditures by Dr. Sriram, for home improvements and family vacations reflect "a rather exorbitant life style," as the Government argues (*Id.*, at 4), or instead were "therapeutic" and thus appropriate, as defense argues (Def.'s Reply at 15); or whether Dr. Sriram can or should engage in some type of employment "to defray legal expenses" (Gov't. Mem. at 4). These arguments fall outside the metes and bounds of the standards set in the amended preliminary injunction order for release of funds, and thus will play no part in the Court's consideration of the motion.

Nor does it matter whether Dr. Sriram and his wife have made the defense of this matter "the highest priority in [their] lives" (which is to be expected), and thus would like to see all of the amounts sought to be released (Def. Reply Mem. at 19 and Exs. A and G). With respect to funds that are not subject to the agreed preliminary injunction order, Dr. Sriram is free to spend as much as he may wish to defend the case (the Court expresses no view as to whether any of that money may be subject to forfeiture if Dr. Sriram is convicted in the criminal case, or if the Government

succeeds in the civil action, or if the IRS pursues a tax deficiency). But under the agreed preliminary injunction order, the standard for releasing funds is not merely how much Dr. Sriram wishes to spend; the standard is whether the amount earlier released is insufficient because the legal fees and expenses are higher than anticipated, and whether the amounts already released have been reasonably spent.

That said, we now examine the defendant's contentions that (1) unforeseen developments since April 30, 2001 have rendered the case far more complex and the original amount withdrawn inadequate; and (2) the expenditures of the original amount provided for attorneys' fees and costs have been reasonable.

## II.

Defendant has raised a myriad of arguments in support of his contention that circumstances unknown as of April 30, 2001 have revealed that the case is far more complex and costly than defense counsel believed when it embarked on the case. We discuss first those arguments that we do not find persuasive, and thus reject:

- Defendant argues that the case was made more complex because the Government failed to provide a bill of particulars as to the charges (Def. 12/19/01 Submission at 2). Apart from the fact that the Government refusal to provide a bill of particulars was sustained by the district judge (*see* 04/05/01 Minute Order in 00 CR 894), the denial of the bill of particulars occurred nearly one month before entry of the amended preliminary injunction order. Thus, the fact that the defense would not receive a bill of particulars was known to defense counsel and is not an after-the-fact surprise that makes the case more complex than they thought as of April 30, 2001.

- The defense complains that the absence of a bill of particulars made it necessary for defense counsel to carefully review the 84,000 pages of written discovery and 15 gigabytes of electronic discovery (Def. Mot. at 7; Def. 12/19/01 Submission at 2). However, the Court suspects that with or without a bill of particulars, defense counsel would have carefully reviewed the

8

discovery material. Moreover, the defense does not point to any reason why this volume of documents would have been unforeseen; and, in any event, counsel already has completed review of this discovery (*See* Government's 01/15/01 Response to Defendant's Motion to Vacate the Trial Date in 00 CR 894 at 4).

- The defense points to the use of 23 agents in investigating the case (Def. Mot. at 8). However, standing alone, the number of agents used does not necessarily reflect the complexity of the case. And, the Government has represented that the vast majority of them were used on an *ad hoc* basis to complete particular interviews with patients or other witnesses (*See* Gov't. Mem. at 7).

- The defense asserts that it has discovered the case is more complicated than originally thought because of the need to substantiate numerous instances where Dr. Sriram allegedly underbilled, to refute the inference that he engaged in intentional overbilling (Def. Mot. at 7). However, this is a theory that predecessor defense counsel advanced during the preliminary injunction hearing: defense counsel argued that Dr. Sriram was not sophisticated in the intricacies of Medicare billing; that his practice was administratively disorganized; and that this led to inaccuracies in billing that ran both ways. Thus, the need to develop evidence to support this theory is something that defense counsel knew or should have known as of the entry of the amended preliminary injunction order; it is not a new or unforeseen development.

- The defense also asserts that the increased complexity of the case is revealed in a second superseding indictment that was filed on January 10, 2002, while this motion was pending (Def. Reply Mem. at 4-5 and Ex. B). In aid of this argument, the defense correctly points out that the second superseding indictment increases the number of counts from 24 to 64, and the time scope of the fraud charge in Count I by 16 months. However, the description of the conduct in Court I that allegedly constitutes the scheme to defraud is not materially different than that set forth in the first superseding indictment, which was returned on February 22, 2001 – well before entry of the amended preliminary injunction order. Of the eleven mail fraud counts (2-11), seven involve the same mailings as alleged in the first superseding indictment. All of the healthcare allegations in Counts 13-21 are the same as those asserted in the first superseding indictment. All of the tax fraud counts (61-64) are identical to the tax fraud counts asserted in the first superseding indictment. Of the remaining new counts, the vast majority deal with claims of unnecessary cardiac catheterizations (25-39), instances of services claimed but not provided (40-50) and reimbursement claimed for services alleged to have been delivered to patients on dates after they were deceased (51-60).

All of these claims of misconduct were either presented during the preliminary injunction hearing in January 2001, or were otherwise brought to the attention of the defense prior to April 30, 2001. Indeed, these instances of alleged fraud concerning claims for specific patients is, in substance a "particularization" of the general scheme to defraud alleged in Count I. In the Court's view, this second superseding indictment may provide more focus to the preparation and trial of the matter, and thus is not likely to materially increase the complexity of the case.

- The defense also asserts that the case has been made more complex by virtue of a study from Edgewater Hospital concerning the length of time that Dr. Sriram (and certain other doctors) hospitalized patients for the same illness. However, the first superseding indictment plainly charges that Dr. Sriram "hospitalized certain patients who did not need to be hospitalized, knowing that those patient admissions were medically unnecessary" (First Superseding Indictment, ¶ 6). The fact that the Government has chosen to offer data such as a hospital utilization study to try to prove that allegation is something that reasonably could be anticipated.[4]

The Court has focused thus far on those matters that it finds would not increase the complexity of the case beyond what was anticipated at the time the amended preliminary injunction order was entered on April 30, 2001. However, the Court agrees with the defense that there are several factors that do make this case more complex – or more time intensive – than defense counsel reasonably could have anticipated in April 2001.

*First*, on December 5, 2001, the Government informed defense counsel that tape recordings in *United States of America v. Bainbridge Management*, 01 CR 469, may be offered against Dr. Sriram under a conspiracy theory. The next day, December 6, the Government provided Dr. Sriram's defense counsel with a tape log and transcripts of 923 tape recordings. The defense asserts, without contradiction by the Government, that these recordings fill 8,512 transcript pages. The Government asserts that the defense need not plow through each and every tape and transcript,

_____

[4]Contrary to Defendant's assertion (Def. Reply Mem. at 17), the Court has not previously expressed – and does not now express – any view as to the validity or persuasiveness of this study.

since the Government "pinpointed on which tapes Sriram is mentioned" and "summarized the most incriminating tapes in the Santiago proffer" (Gov't. Mem. at 6 and Ex. 6). However, the Government's letter "pinpointing" the tapes on which Dr. Sriram's name is mentioned also states that "there may be additional reference to Sriram on the tapes" beyond those identified (Gov't. Mem., Ex. 6). Moreover, we are persuaded that diligent counsel reasonably would see to it that all the tapes were reviewed: not only to see what incriminating information might be on them, but also to see if there is anything exculpatory to be found. Even with the aid of transcripts, listening to 923 tapes and verifying that the transcripts accurately reflect what was spoken is a substantial task. Allowing an average of three minutes per transcript page, that task would consume some 426 hours of time. That is a substantial amount of time that could not have been reasonably anticipated as of April 30, 2001.

*Second*, the defense argues that as of the time of the amended preliminary injunction order, the Government was asserting only 24 unnecessary cardiac catheterizations, but then in August expanded the scope of that portion of the case to a total of 117 unnecessary cardiac catheterizations (Def.'s Mot. at 3-5). The exhibits attached by defendant in support of this argument showed that the Government offered summaries concerning its expert's review of 24 patient files on this subject on March 29, 2001, and then on August 28, 2001, supplied another 93 files (Def.'s Mot., Exs. 3, 4). The Government states that it informed defense counsel that all of the cardiac catheterizations performed by Dr. Sriram at Edgewater Hospital would be reviewed, which totaled 117 (Gov't. Mem., at 5), an assertion that the defense does not contest in its reply brief. Thus, the defense was aware as of April 30, 2001 that a review would be necessary for at least 24 cases, and up to as many as 117.

11

However, the Court cannot fault the defense for failing to anticipate that so many of those claims would be added.

Moreover, we believe the addition of these 93 cardiac catheterizations by Dr. Sriram does add to the complexity and cost of the case. We have some sympathy with the Government's position (Gov't. Mem. at 5-6) that the key question is what information Dr. Sriram had when he performed the catheterizations – an inquiry that will not be advanced by review of the voluminous other records that may pertain to these patients, which Dr. Sriram did not consult at the time. Nonetheless, we can envision the possibility that there are other records that, even if not consulted by Dr. Sriram, might tend to corroborate, or undermine, his position that the procedure was necessary in a given case. Accordingly, we agree with the defense that this adds to the complexity of the case, and to its cost (although we envision most of that cost to be in the duplication of documents obtained by subpoena, and in expert analysis – not in lawyer time).

*Third*, on September 26, 2001, the Government produced an expert report concerning the claim of unnecessary cardiac catheterizations that discussed some 151 such catheterizations performed by another doctor, Andrew Cubria. While Dr. Sriram was the referring physician in connection with only some of the procedures performed by Dr. Cubria, defense counsel represents that the Government has not agreed to any limitation on the evidence that it might offer of Dr. Cubria's catheterizations under a co-scheme or co-conspirator theory (Def. Reply Mem. at 6-7). The defense could not reasonably have anticipated that 151 procedures by another doctor – including those which had not been referred by Dr. Sriram – would find their way into the case. And, for the reasons stated above, we believe this will add to the complexity and cost of the case.

*Fourth*, the Court finds that the continuation of the trial date and its projected length also are relevant considerations. At the time the amended preliminary injunction order was entered, the trial of the criminal case was set for November 6, 2001. At defendant's request, that trial date has been extended twice: on September 13, 2001, the district judge reset the trial for April 15, 2002, and on January 16, 2002, the district judge reset the trial to commence on September 10, 2002. The amended preliminary injunction order provided that of the $1 million released on April 30, 2001, $7,500.00 a month would be available to Dr. Sriram for ordinary living expenses. The continuance of the trial date for ten months means that Dr. Sriram will receive at least ten months of additional payments for living expenses (a total of $75,000.00): payments which the defense anticipated would be available for legal expenses. Although these continuances were obtained at the behest of Dr. Sriram's counsel, the Court does not believe that the defendant should be penalized for having succeeded in his argument to the district judge that the continuances were warranted.

Moreover, the projected duration of the trial now is longer than was the case in April 2001. At that time, a two-week trial was projected; now, the projected trial length is closer to one month. We have no reason to believe that the defendant did not have the right to rely on the Government's trial estimate back in April 2001, or that the defendant's current trial estimate of one month is excessive. Doubling the trial time also will significantly increase the cost of having Dr. Sriram's counsel defend the case at trial.

13

## III.

Having identified unforeseen developments in the case that render it more complicated and costly than originally anticipated, the Court now considers whether those unforeseen developments render the original $1 million released insufficient. The answer to that question requires two inquiries: *first*, whether the additional complexities are likely to add additional costs to the case, and *second*, whether the amount originally released has been reasonably spent. We address each of those points in turn.

## A.

The Court has little doubt that the unforeseen developments that render the case more complicated will also render it more expensive to prepare and defend at trial. As the Court already has stated, a preliminary review of the transcripts and audiotapes alone reasonably could take more than 400 hours. Even assuming the review was done by a paralegal, at a rate of $150.00 an hour, that review would come to more than $60,000.00 of added expense that was not anticipated when the agreed preliminary injunction order was entered.

In addition, the Court expects that the work which was not reasonably anticipated will have to be done to respond to the numerous instances of alleged unnecessary cardiac catheterizations, including 151 conducted by Dr. Cubria. Most of the additional time and expense involved in this preparation, the Court expects, would be for obtaining documents and conducting expert analysis; but the Court expects that expert analysis will not come cheaply.

Furthermore, as noted above, the continuance of the trial for ten months will cause some $75,000.00 that otherwise could have been devoted to the defense of the case to be diverted to ordinary maintenance of Dr. Sriram and his family. And, the fact that the trial is likely to be one

month in length, as opposed to two weeks in length, adds substantial additional trial costs. For purposes of this analysis, the Court estimates the cost of trial to be approximately $250,000.00.[5] We assume that this is twice the amount that would be expended for what originally was anticipated would be a two-week trial.

Accordingly, the Court believes that the new developments and added complexities in the case will add at least $260,000.00 in costs of beyond those anticipated at the time the April 30, 2001 order was entered ($125,000.00 in added costs due to doubling the trial length; $60,000.00 for review of the tapes; and $75,000.00 in funds diverted to Dr. Sriram's living expenses). And, this estimate does not account for the added costs of attorneys' fees or expert time that may be attributable to the significant expansion of the unauthorized cardiac catheterization portion of the case.

## B.

The question remains as to whether the $1 million released on April 30, 2001 was spent reasonably. Of that amount, $98,599.14 was paid to Dr. Sriram's former counsel (the Cotsirilos firm), which had represented Dr. Sriram both in the criminal proceeding and in the preliminary injunction proceedings in this Court. Another $52,500.00 had been used by Dr. Sriram for living expenses, as contemplated by the amended preliminary injunction order (and an additional $22,052.10 for property taxes and insurance). Of the remaining $826,848.76, $714,951.25 was spent

---

[5]In making this calculation, the Court assumes that Dr. Sriram would be represented at trial by Mr. Miller and Mr. Hersh (*see* 12/19/01 Def. Submission, at 7 n. D), who have billing rates of $395.00 and $350.00, respectively. For a one-month trial, we assume that each attorney will bill 12 hours a day for 26 days (22 trial days and 4 weekend days), for a total of 312 hours each. This would come to $123,240.00 for Mr. Miller and $109,200.00 for Mr. Hersh, for a total of $232,440.00. In addition, we assume that one other attorney and one paralegal would be providing trial support for that one-month period. We assume 100 hours for the paralegal at $140.00 per hour, and 50 hours for the other attorney at $175.00 per hour. This comes to a total of $22,750.00 which, when taken together with the amount expended by trial counsel, would total somewhat more than $250,000.00.

15

on attorney and paralegal fees, and $64,616.38 was spent on costs, leaving only $47,281.13 as of the beginning of December 2001 – which no doubt has been reduced by at least another $22,500.00 for Dr. Sriram's monthly draws for living expenses in December, January and February.

The Court has reviewed the detailed time entries submitted by the defense to determine the reasonableness of the expenditures. In so doing, the Court is mindful that what appears "reasonable" or "necessary" often seems more evident in hindsight than it does in foresight. The Court also considers the significant stakes of this criminal matter for the future of the defendant and his family. Moreover, we take into account that Dr. Sriram has selected a large firm to conduct his defense, which he was free to do, and that this choice had certain consequences. Specifically, the cost structure of a large firm typically differs significantly from that of a sole practitioner or a small firm, with the result that a large firm defense often will cost more than a defense by a sole practitioner or a small firm.

The need to protect the privacy of defendant and his counsel in their efforts to prepare for their defense at trial substantially limits the Court in what it may disclose about its analysis of the billing records. The amended preliminary injunction order makes it clear that defendant's attempt to obtain withdrawal of the funds does not come at the price of waiving the attorney-client and work product privileges (04/30/02 Am. Prelim. Inj. Order ¶ 4(C)). Consistent with the need to respect the privacy of defendant's trial preparation, the Court can appropriately make the following observations.

*First*, as the Court noted at the first hearing concerning this motion, we have a concern that certain of the expenditures for legal research appear excessive – and the explanation offered by defendant (Def. Reply Mem. at 18-19) does not dispel that concern. We have no doubt that there

are evidentiary and other legal matters that the defense may wish to raise. However, we are also

mindful that defendant's trial counsel are both extraordinarily experienced and accomplished trial

lawyers with vast experience in criminal law. In light of that consideration, as well as the nature of

the legal issues presented, that the Court believes that some of the research time spent exceeded that

which was necessary or reasonable.

*Second*, the Court's review of the time records suggests that despite the substantial amount

of time devoted to the case, the defense is not as far along in its development of certain aspects of

the case as might be expected. Without revealing privileged information, the Court points out that

these aspects include matters of the case of which the defense was aware prior to December 2001.

*Third*, the Court is concerned that the $1 million that was deemed adequate to take the case

through trial in April 2001 (after deductions for payments to predecessor counsel and payments for

Dr. Sriram's living expenses) was almost fully exhausted by the end of November 2001 on matters

that were known or that counsel reasonably could have anticipated as of April 30, 2001 – and with

no trial even in sight. By any account, spending more than $760,000.00 during some seven months

of representation (an average of nearly $110,000.00 each month) is substantial.[6] The more than

4,000 hours scheduled to the defense by attorneys and paralegals is the equivalent of two lawyers

or staff spending an entire work year on this matter. The mere fact that so many hours have been

spent in such a short time does not necessarily mean that the time has been spent inefficiently. At

the same time, the billing records indicate (and lead defense counsel has confirmed) that defense

counsel billed for every single one of the 4,000 plus hours entered into the time system through

---

[6]Although the representation commenced in March 2001, only a small portion of the hours and fees are attributable to the period prior to April 30, 2001.

November 30, 2001, and recovered for every single one of those hours through withdrawals from the escrow fund. No time was written down or written off to reflect any duplication of efforts (such as, for numerous meetings) or other inefficiencies (such as, excessive research by an exuberant young attorney). That is not what the Court would expect if bills of this magnitude were being paid by a client out of his or her own pocket on a monthly basis, instead of from a fund to which the client does not otherwise have ready access. This suggests that the presence of additional money in Account 7538 may have led to a less disciplined approach to the pretrial work (and the billing for it) than would have been the case if the defense knew that no further money would be available.[7]

*Fourth*, the substantial amount of work done so far should facilitate the ability of defense to efficiently pursue the remainder of trial preparation. One example of this point is extensive work done by the defense in reviewing and organizing various records (*See* Def. Reply Mem. at 12-13).

*Fifth*, the Court is concerned that based on the general price tag that the defense has suggested for experts and duplication of documents being sought by subpoena, the remaining $583,000.00 (which will be closer to $500,000.00 when deductions are made for the monthly living expenses of Dr. Sriram through the criminal trial) will be exhausted well before the month-long trial even commences. Defense counsel has given no assurance that this will not happen; they have not provided any indication of what they would do if it were to happen; and they have not indicated whether Dr. Sriram is able, or willing, to use other assets he may have to pay for additional costs.

---

[7]The Court also notes that while defense counsel has charged only its customary rates here, the rates charged were the customary "premium" rates. In addition, the rates billed for paralegals may exceed what is customary in the large firm market. Recent cases in this district have approved up to $100.00 per hour as a reasonable rate for highly experienced paralegals, *See, e.g., Hardison v. Galaxy Recovery Systems, Inc.*, 00 C 2280, 2001 WL 1555197 (N.D. Ill., Dec. 4, 2001); *Pepsico, Inc. v. Ortiz Mexi-Products, Inc.*, 97 C 7082, 2000 WL 198843 (N.D. Ill., Feb. 14, 2000). Even if the average rate were $120.00 (accounting for rate increases since those decisions), the significant amount of fees attributable to paralegal work would be substantially reduced.

## IV.

The foregoing leads the Court to find that the unanticipated developments in the case have rendered certain aspects of the trial preparation and trial more complex and expensive; and that while the Court has some concerns about the defense expenditures to date, on balance, the unforeseen developments warrant release of additional funds. Therefore, the Court will authorize release of the remaining amounts for the costs of defense and Dr. Sriram's ordinary living expenses through trial. However, the Court will do so in a fashion that satisfies the Court that adequate funds will remain to try the case in September 2002.

The Court authorizes the release of all unfrozen funds in Account 7538 – except for $250,000.00 – to be used for payment for Dr. Sriram's ordinary living expenses and for trial preparation. The remaining $250,000.00 is the amount that the Court has estimated for the cost of trial itself. Phasing the withdrawal of funds in this manner may promote their efficient use.[8] To the extent that the defendant wishes to spend more than the amount released by this Court during the pre-trial period, or more than the amount that will be released for the trial, Dr. Sriram is free to spend any additional funds he may possess that are not covered by the amended preliminary injunction order. However, any such additional funds are not subject to Paragraph 4(D) of the amended preliminary injunction order, and thus may be subject to competing claims by the Government.[9]

---

[8]For example, the tenor of defendant's arguments suggests that the defense believes the Government is pursuing an overly broad case: such as, with respect to the claims of unnecessary cardiac catherizations. To the extent that is the defense position, on this or other aspects of the Government's case, the defense is free to file or consider filing early motions to narrow portions of the Government case, as an alternative to fully preparing for the broadest possible trial and, only on the eve of trial, filing motions to limit the scope of the case.

[9]Defense counsel has disclosed that they have an agreement with Dr. Sriram to hold back $200,000.00 of any amount released by the Court, to be used (if approved by the Court) for payments to Dr. Sriram's family during the pendency of the civil case if he is incarcerated after conclusion of the criminal case (*See* 02/20/02 S. Miller Aff. ¶ 4). In light of the affidavits submitted on this motion by defendant and his wife stating that they make the defense of the

**CONCLUSION**

For the foregoing reasons, defendant's motion for release of funds (doc. #53) is GRANTED in part. The Court hereby authorizes the immediate release of all unfrozen funds in Account 7538, except for $250,000.00. The funds are to be used solely for the purposes designated in Paragraph 4(B)(i),(ii) of the amended preliminary injunction order. To the extent that, upon petition by defendant at the time of trial, this amount is shown to be insufficient to cover trial expenses, the Court will authorize release of additional amounts remaining in Account 7538 that exceed $1,651,527.05 (and the interest that has accrued on that sum since February 9, 2001) as necessary to pay for legal expenses at trial.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: February 21, 2002**

---

criminal matter their "highest priority," it will be for Dr. Sriram and his counsel to decide whether they will revisit that agreement.